

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-11-00124-CV
_____

ENDSLEY ELECTRIC, INC., D/B/A INDUSTRIAL
POWER SYSTEMS OR INDUSTRIAL POWER SYSTEMS, INC., ET AL., Appellants

V.

ALTECH, INC., Appellee

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 10-C-0645-CCL

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

## I.  Procedural History

Altech, Inc., a general contractor, contracted to build an intermediate school for the Pleasant Grove Independent School District (the Project).  Endsley Electric, Inc., doing business as Industrial Power Systems or Industrial Power Systems, Inc., entered into a subcontract with Altech to provide the electrical and fire alarm work on the Project.  In April 2010, shortly after the Project was completed, Altech filed a breach of contract suit against Endsley Electric[1] in the County Court at Law of Bowie County, Texas.  The suit also named as defendants Endsley Electric's corporate officers Karen Endsley and Brad Endsley, each individually and doing business as Industrial Power Systems (IPS).  Altech asked for damages based on allegations that it paid Endsley's suppliers $59,333.83 and that the owner removed $31,890.00 from its contractual pay to cover work that Endsley failed to do.

After a bench trial, where Endsley Electric and Karen appeared pro se, the court determined that Endsley Electric and Karen and Brad, individually, were all jointly and severally liable and rendered judgment in favor of Altech for damages of $91,223.83, attorney's fees of $7,961.00, and prejudgment interest of $6,210.72.

On appeal, Endsley Electric and Karen and Brad contend that:  (1) the pleadings do not allege or support individual liability; (2) there is legally and factually insufficient evidence supporting the trial court's finding of individual liability; (3) there is legally and factually insufficient evidence to support $31,890.00 in damages; and (4) there is legally and factually

---

[1]Unless otherwise noted, we refer collectively to the named defendants as "Endsley Electric."

insufficient evidence to support the award of attorney's fees because Altech failed to segregate its attorney's fees.

We reverse the judgment, rendering part and remanding in part, because: while the pleadings may allege individual liability, there is legally insufficient evidence to support individual liability; there is legally insufficient evidence that the defendants are liable for $31,890.00 of the damages that were awarded; and Altech failed to segregate its damages.

## II. Facts

Karen is the president and sole stockholder of Endsley Electric. Brad is the vice president, but, according to Karen's testimony, he

> has gone off on his own. He's no longer part of the company at all. He has his own tax ID number and everything, so he never even – he's not even an electrician. He didn't have anything to do with this job whatsoever.

Karen signed the contract with Altech as president of IPS. IPS, with Karen listed as the president and chairman of the board of directors, merged with Endsley Electric in 2004, and since then has been one of Endsley's assumed names. Prior to the merger, Karen and her late husband operated IPS and Endsley Electric as two separate corporations, having two different tax identification numbers, with one company doing work in Arkansas and the other doing work in Texas. According to Karen, her late husband decided "to combine them because one set of books was easier to keep than two sets."[2]

Altech alleged that it had to pay Endsley Electric's suppliers $59,333.83 for materials provided on the Project. Altech also claimed that Endsley Electric failed to remove and relocate

---

[2]It is unclear in the record whether Karen is referring to her husband's decision to combine the two companies' books or combine the two companies entirely.

3

power lines and that due to its failure, the school district issued a change order and directly paid $31,890.00 to another electrical contractor to perform the work and reduced Altech's contractual pay by the same amount. Altech also alleged that it wrote joint checks to Endsley Electric and its suppliers and that it was directly paying its workforce.

Endsley Electric denied being liable for any of the claimed damages. Karen denied refusing to pay any supplier and testified that all the suppliers had been paid. She claimed that the joint checks for the suppliers were agreed to "up front" and that the funds Altech directly paid to Endsley Electric's workforce "would all come out of the draw" that would have been paid to Endsley Electric anyway. Karen said, "When it worked, everything was going great until we got to the end of the job and that's when things went crazy." Endsley Electric filed a motion for new trial and notice of appeal. No findings of fact or conclusions of law were entered, though a request was made, and Endsley failed to file a reminder.

## III.    Pleading Requirement

In its first point of error, Endsley Electric argues that the pleadings do not support liability against Karen and Brad as corporate officers. Specifically, Endsley Electric contends that the pleadings fail to allege individual liability and likewise fail to allege a theory of individual liability.

Whether a judgment is supported by the pleadings is a question of law that we review de novo. *See Barber v. Corpus Christi Bank & Trust*, 506 S.W.2d 254, 257–58 (Tex. Civ. App. —Corpus Christi 1974, no writ); *see also Fed. Underwriters Exch. v. Craighead*, 168 S.W.2d 699, 700 (Tex. Civ. App.—Fort Worth 1943, writ ref'd w.o.m.).

4

Altech contends that the allegations in its amended petition sufficiently support individual liability. In the alternative, Altech argues that the issue was tried by consent and that Endsley waived any objections to the individual liability allegations because Endsley failed to object, specially except, or file a verified denial under Rule 93 of the Texas Rules of Civil Procedure.[3]

After examining the pleadings and the record, we need not determine whether the pleadings support individual liability. As further explained below, we find that even if the pleadings support the judgment's finding of individual liability, there is legally insufficient evidence to support the finding.

## IV. Evidence of Individual Liability

In its second point of error, Endsley Electric argues that there is legally and factually insufficient evidence of individual liability on the part of Karen and Brad.

When no findings of fact or conclusions of law are requested or filed, we presume that the trial court made all findings necessary to support its judgment and we affirm if there is any legal theory sufficiently raised in the evidence in support of the judgment. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003); *Moore v. Jet Stream Invs., Ltd.*, 315 S.W.3d 195, 203 (Tex. App.—Texarkana 2010, pet. denied) *(citing Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)). When a reporter's record is filed, however, these implied findings are not conclusive and an appellant may challenge them by raising both legal and factual sufficiency of the evidence issues. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.

---

[3]Rule 93 of the Texas Rules of Civil Procedure requires certain pleadings to be verified, including a pleading that "the defendant is not liable in the capacity in which he is sued." TEX. R. CIV. P. 93(2).

5

2002). When such issues are raised, the applicable standard of review is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam).

In determining whether the evidence is legally sufficient, we must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). We may not substitute our judgment for that of the trial court, and we will affirm its findings so long as the evidence falls within the zone of reasonable disagreement. *Id.* at 822.

An assertion that the evidence is factually insufficient to support the judgment means that the evidence supporting the judgment is so weak or against the great weight and preponderance of the evidence that it should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *Gnerer v. Johnson*, 227 S.W.3d 385, 389 (Tex. App.—Texarkana 2007, no pet.). We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Gnerer*, 227 S.W.3d at 389–90. In reviewing the evidence, we accord due deference to the trial court which, as the trier of fact presented with conflicting testimony, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Sw. Bell Media*, *Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied). As the sole trier of fact, the trial court is free to believe one witness and disbelieve others; the court may resolve inconsistencies in a witness' testimony. *Id.*

We must determine whether there is sufficient evidence that Karen and/or Brad, individually, breached the contract, that they were individually negligent, and/or whether there is sufficient evidentiary basis to disregard the corporate fiction and hold either or both of them liable as corporate officers or shareholders.

### A.    Breach of Contract

It is undisputed that Altech entered into a written contract with IPS.  Altech's president, Billy Roy, admitted that "this subcontract [is] just with Industrial Power Systems."  It is also undisputed that Karen signed the contract in her capacity as a corporate officer.[4]  There is no evidence that either Karen or Brad, in their individual capacities, entered into or breached any contract with Altech.  Therefore, Altech's claim for breach of contract against Karen and Brad, individually, must fail.

### B.    Negligence

As a prerequisite to asserting a claim of negligence, there must be a violation of a duty imposed by law independent of any contract.  *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991); *Anthony Equip. Corp. v. Irwin Steel Erectors*, *Inc.*, 115 S.W.3d 191, 208 (Tex. App.—Dallas 2003, pet. dism'd).  Where the only duty between parties arises from a contract, a breach of this duty will ordinarily sound only in contract, not in tort.  *DeLanney*, 809 S.W.2d at 494; *Anthony Equip. Corp.*, 115 S.W.3d at 208.  Here, there is no evidence that Karen or Brad, individually, owed a noncontractual legal duty to Altech.  Therefore, Altech's claim for negligence against Karen and Brad, individually, must also fail.

---

[4]The contract is signed "Karen Endsley, Pres."

C.  **Corporate Veil**

The corporate form normally insulates shareholders, officers, and directors from personal liability for corporate obligations, but when these individuals abuse the corporate privilege, courts will disregard the corporate fiction and hold them individually liable. *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006); *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986); *Dominguez v. Payne*, 112 S.W.3d 866 (Tex. App.—Corpus Christi 2003, no pet.). Each case involving disregard of the corporate entity must rest on its own special facts. *Rosenthal v. Leaseway of Tex., Inc.*, 544 S.W.2d 180, 182 (Tex. Civ. App.—Tyler 1976, no writ). The various theories for piercing the corporate veil must be specifically pled or they are waived, unless they are tried by consent. *See Mapco*, *Inc. v. Carter*, 817 S.W.2d 686, 688 (Tex. 1991); *Seidler v. Morgan*, 277 S.W.3d 549 (Tex. App.—Texarkana 2009, pet. denied); *Town Hall Estates–Whitney, Inc. v. Winters*, 220 S.W.3d 71, 86 (Tex. App.—Waco 2007, no pet.).

The limitation on liability afforded by the corporate structure can be ignored when there is evidence that the corporate form has been used for injustice or inequity.[5] *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008). Piercing the corporate veil is possible when the corporate form has been used as an alter ego of another person or corporation

---

[5]The Texas Supreme Court explained:

> By "injustice" and "inequity" we do not mean a subjective perception of unfairness by an individual judge or juror; rather, these words are used in *Castleberry* as shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield--fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like. Such abuse is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a "bedrock principle of corporate law"--that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations.

*SSP Partners*, 275 S.W.3d at 455 (citations omitted).

or if it has been used to perpetrate a fraud, evade an existing obligation, create a monopoly, circumvent a statute, protect a crime, or justify wrong. *Id.* at 451; *Castleberry*, 721 S.W.2d at 272. But the Legislature has required a more stringent standard for piercing the corporate veil in contract actions. By statute, in order to prove that a holder of shares of a corporation is personally liable for contractual obligations of the corporation, the evidence must show that the shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetuate an actual fraud on the obligee primarily for the direct personal benefit of the [shareholder]." TEX. BUS. ORGS. CODE § 21.223(b) (West Supp. 2012).[6]

Altech contends that the corporate veil should be pierced on the theories of alter ego, inadequate capitalization, or misuse of the corporate form. Since all theories of piercing the corporate veil involve some misuse of the corporate form, we examine whether there is sufficient evidence to support the trial court's implied finding of alter ego or inadequate capitalization.

### 1. Alter Ego

The alter ego doctrine is one theory used to pierce the corporate veil. *Seidler*, 277 S.W.3d at 557; *Sparks v. Booth*, 232 S.W.3d 853, 868 (Tex. App.—Dallas 2007, no pet.) (citing *Castleberry*, 721 S.W.2d at 272). It applies when there is a unity between the corporation and the individual to the extent that the corporation's separateness has ceased, and holding only the corporation liable would be unjust. *Seidler*, 277 S.W.3d at 557; *see SSP Partners*, 275 S.W.3d 444. Alter ego is shown from the total dealings of the corporation and the individual, including factors such as: (1) the payment of alleged corporate debts with personal checks or other

---

[6]Since the parties direct their argument to the alter ego issue, we will discuss that evidence even though no argument is made that the Endsleys perpetrated an actual fraud on Altech.

commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his or her personal use; (4) inadequate capitalization;[7] (5) whether the corporation has been used for personal purposes; and (6) other failure to keep corporate and personal assets separate. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990); *Sparks*, 232 S.W.3d at 868; *Carone v. Retamco Operating, Inc.*, 138 S.W.3d 1, 13 (Tex. App.—San Antonio 2004, pet. denied); *Pinebrook Props., Ltd v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 499 (Tex. App.—Texarkana 2002, pet. denied).

There must be something more than mere unity of financial interest, ownership, and control for a court to treat an officer, director, or shareholder as the corporation's alter ego and make an officer, director, or shareholder liable for the corporation's actions. *See Lucas*, 696 S.W.2d at 374–75; *Hanson Sw. Corp. v. Dal–Mac Constr. Co.*, 554 S.W.2d 712 (Tex. Civ. App.—Dallas 1977, writ ref'd n.r.e.).

Altech argues that "[w]hether based on the corporate officer's actions, piercing the corporate veil, alter ego, misuse of the corporate form, or some other theory of liability, manifest injustice would occur should the officers not be held financially liable as Appellee would be left with an uncollectible judgment against a corporation with little or no assets or means to pay." Altech contends that three pieces of evidence support piercing the corporate veil: (1) Endsley

---

[7] Inadequate capitalization is another basis for disregarding the corporate fiction, though alone, it is not sufficient to pierce the corporate veil. *Torregrossa v. Szelc*, 603 S.W.2d 803 (Tex. 1980); *Ramirez v. Hariri*, 165 S.W.3d 912, 917 (Tex. App.—Dallas 2005, no pet.). Thus, a party who has contracted with a financially weak corporation and is disappointed in obtaining satisfaction of his or her claim cannot look to the dominant stockholder, officer, or parent corporation in the absence of exceptional, compelling circumstances. *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 375 (Tex. 1984); *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 340 (Tex. 1968); *Wilson v. Davis*, 305 S.W.3d 57, 69 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

Electric's corporate charter was forfeited and not in good standing; (2) "Karen Endsley admitted to the company's lack of capitol [sic] to meet the financial obligations of the company in reference to the [P]roject"; and (3) Endsley Electric kept only one set of books for both IPS and Endsley Electric.

Altech relies primarily on *Mancorp*, *Inc. v. Culpepper*, *Tigrett v. Pointer* and *Torregrossa v. Szelc*. In *Mancorp*, a building contractor, Mancorp, and Culpepper Properties, Inc., filed claims and counterclaims against each other, both alleging breach of a construction contract. 802 S.W.2d at 227. The Supreme Court of Texas noted that: (1) the construction loan was made to Culpepper Properties, Inc., and Culpepper individually; (2) Culpepper personally guaranteed the loan; (3) Culpepper told Mancorp's vice president that he was personally behind the project; (4) Culpepper did business under the corporate name Culpepper Properties, Inc., and personally under the name Culpepper Properties; (5) Culpepper submitted the proposal for the project under the name Culpepper Properties rather than Culpepper Properties, Inc.; (6) he signed a change order personally under the name Culpepper Properties; and (7) Mancorp thought that it was doing business with Culpepper, the individual, and that he was paying for the job. *Id.* at 229.

In *Tigrett*, a garnishment proceeding, Tigrett, holder of a judgment against Heritage Building Company, sought to pierce the corporate veil and hold Pointer, the corporation's president and sole stockholder, personally liable for the debt. 580 S.W.2d 375, 378 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.). Tigrett alleged that Pointer used two companies as alter egos, and she introduced evidence that Pointer had made personal loans to the companies that amounted to more than 400 times the initial capitalization as well as other loans secured by the

11

corporation's real estate holdings.  In holding that the theory of alter ego had been proven as a matter of law, the court of appeals noted that

> when a corporation transfers virtually all its assets to its controlling stockholder to repay his advances, without providing for other creditors, the court may consider the amount of the capital stock as compared with the funds that the stockholder has actually invested in the enterprise as one of the factors in determining whether his manipulation of the corporate form of business organization to serve his individual interests justifies imposition of personal liability.

*Id.* at 399 (op. on reh'g).

In *Torregrossa*, a trial court pierced the corporate veil on the theory of alter ego.  603 S.W.2d 803.  The Texas Supreme Court found no evidence of a sham corporate structure and found no support for a finding of alter ego.  *Id.* at 804.  The court noted that the corporation was formed with the minimum capital of $1,000.00, but noted "there is no showing that this was an unfair device designed to achieve an inequitable result."  *Id.*  Indeed, citing a lack of evidence that there were unpaid creditors, what the assets were when the charter was forfeited, or what happened to those assets, the court concluded "there is no showing that this corporation was under capitalized."  *Id.*

Here, there is no evidence that Karen or Brad supported the project with personal funds, represented to anyone that they were personally backing Endsley Electric or IPS, commingled personal and company funds, manipulated or transferred Endsley Electric's assets or liabilities, made loans to or from the company, prioritized themselves as creditors, or otherwise abused the corporate form, which distinguishes this case from *Mancorp* and *Tigrett*.  The fact that Endsley Electric may have lacked the funds or cash flow to pay all of its bills does not render

12

shareholders or officers liable for corporate debt.  *See Tigrett*, 580 S.W.2d at 399 (op. on reh'g).[8]

Rather, this case is similar to *Torregrossa*, in that there is "no showing that this corporation was under capitalized" because Altech failed to produce any evidence regarding the level and/or status of Endsley Electric's capital, other assets, debts, and liabilities.  *See Torregrossa*, 603 S.W.2d at 804.

### 2.    Forfeiture of the Corporate Charter

Altech produced an exhibit that appears to be a webpage from the state comptroller's office showing Endsley Electric as "NOT IN GOOD STANDING."  The exhibit and the record are silent as to the time period to which the page referred, though the date 3-3-2011 appears at the bottom.  According to a letter from the Secretary of State's office, the corporate charter of Endsley Electric was forfeited[9] on January 28, 2011, but Karen testified that "[i]t has been reinstated" and the company was in good standing.  However, Karen failed to produce written proof that the charter was reinstated or that the company was in good standing.

---

[8]On rehearing, the *Tigrett* court noted:

> Our opinion should not be understood as holding that a stockholder is liable for a corporate debt merely because the corporation has insufficient funds.  Neither should it be taken as holding that personal liability is necessarily imposed on a stockholder who makes advances of personal funds to a financially weak corporation.  We hold, rather, that when a corporation transfers virtually all its assets to its controlling stockholder to repay his advances, without providing for other creditors, the court may consider the amount of the capital stock as compared with the funds that the stockholder has actually invested in the enterprise as one of the factors in determining whether his manipulation of the corporate form of business organization to serve his individual interests justifies imposition of personal liability
> .

*Tigrett,* 580 S.W.2d at 399 (op. on reh'g).

[9]The charter was forfeited under Section 171.309 of the Texas Tax Code, which permits the Secretary of State to forfeit the charter or certificate of authority of a corporation if the Secretary (1) receives the comptroller's certification, (2) the corporation does not revive its forfeited corporate privileges within 120 days after forfeiture of its privileges, and (3) the corporation does not have assets from which a judgment for any taxes may be satisfied. *See* TEX. TAX CODE ANN. § 171.309 (West 2008).  In this case, it appears the charter was forfeited due to failure to pay franchise taxes, as Karen referred to the forfeiture as "[t]he franchise tax certification thing."

When the Secretary of State forfeited Endsley Electric's charter, the entity Endsley Electric, Inc., was terminated. TEX. TAX CODE ANN. § 171.309; TEX. BUS. ORGS. CODE ANN. §§ 11.001(4), 11.251 (West Supp. 2012). However, under Section 11.356 of the Texas Business Organizations Code, the company continued to exist beyond its termination for the limited purpose of defending, in its own name, Altech's suit against it, and it would continue to exist in this state "until all judgments, orders, and decrees have been fully executed" and the company's property is applied and distributed to satisfy any creditors.[10] TEX. BUS. ORGS. CODE ANN. §§ 11.053, 11.356(a)(1), (c)(1)–(2) (West Supp. 2012). Directors and officers cannot be held personally responsible for liabilities created or incurred prior to the corporate forfeiture.[11] *See* TEX. TAX CODE ANN. § 171.255 (West 2008); *Serna v. State*, 877 S.W.2d 516, 519 (Tex. App.—Austin 1994, writ denied). For the officers or directors to be liable, "[t]he liability must be 'created or incurred' after the forfeiture of corporate privileges." *Serna*, 877 S.W.2d at 519.

Here, the contract was signed in October 2008 and completed in March or April 2010. The suit was filed on April 14, 2010. The charter was revoked in January 2011, and the judgment was entered in this case in August 2011. There is no evidence that the liability in this case was created or incurred after the corporate forfeiture. Accordingly, the forfeiture of the corporation charter does not support personal liability.

---

[10]Under Section 11.356(a) and (c) of the Texas Business Organizations Code, a terminated corporation can function for this limited purpose for three years, though if an action is brought against the corporation within the three-year period, the corporation's existence can continue indefinitely until the provisions of subsection (c) are satisfied. TEX. BUS. ORGS. CODE ANN. § 11.356(a), (c) (West Supp. 2012).

[11]The holding in *Serna* presumably does not apply to cases where circumstances allow the court to disregard the corporate form. *See Serna*, 877 S.W.2d 516.

14

### 3. Lack of Capital

As discussed, undercapitalization can be a factor in determining whether an individual is the alter ego of the corporation, but alone is insufficient. *Torregrossa*, 603 S.W.2d 805. Contrary to Altech's argument, Karen did not admit that the company lacked sufficient capital. Her testimony indicated that Endsley Electric was under financial stress from having lost its primary client. The financial evidence introduced at trial regarded whether and through what means Endsley Electric's materials suppliers and workers had been paid. There is neither evidence regarding Endsley Electric's capital, nor is there evidence that assets or liabilities were shifted or transferred in order to render the company insolvent.

### 4. One Set of Books

Any evidence indicating that Endsley Electric maintained one set of books for both IPS and Endsley Electric is irrelevant because the two companies were legally merged in 2004, four years prior to the contract at issue.

After viewing the evidence in the light most favorable to the judgment, we find there is less than a scintilla of evidence supporting an implied finding of alter ego or some other abuse of the corporate structure. As previously mentioned, Altech made no effort to demonstrate that the Endsleys perpetrated any actual fraud on it and for that reason alone, individual liability could not attach to this corporate debt. TEX. BUS. ORGS. CODE ANN. § 21.223(b). Accordingly, we reverse the judgment insofar as it finds Karen and Brad individually liable.

## V. Responsibility for Relocating Electrical Lines

The trial court awarded Altech $91,223.83 in damages, consisting of $59,333.83 that Altech allegedly paid Endsley Electric's suppliers and $31,890.00 that the owner, Pleasant Grove

15

Independent School District (PGISD), removed from Altech's contractual pay to cover the cost of removing and relocating certain power lines on the Project. In its third point of error, Endsley Electric contends that there is legally and factually insufficient evidence that it is liable for the $31,890.00 in damages.[12]

The subcontract, the contract between Altech and Endsley Electric, requires Endsley Electric, who is doing business on this project as IPS, to

> [p]erform all Electrical and Fire Requirements as per Contract Drawings, Specifications and Addendums 1, 2 and 3. Alternates 1, 2, 3 and 9 are accepted and made part of this subcontract. IPS's Proposal dated 9/18/2008 is made part of this subcontract.

Roy testified that removing and relocating the power lines was Endsley Electric's responsibility because "it's stated on the drawings on ME1.1." Section E2, the portion of page ME1.1 pertaining to the power lines at issue, states:

> CONTRACTOR SHALL COORDINATE THE REMOVAL OF EXTG OVERHEAD PRIMARY AND SECONDARY POWER, TELEPHONE, AND CATV SERVICE CABLING AND POLES WITH SERVING UTILITY PROVIDER PRIOR TO BID. CONTRACTOR SHALL INCLUDE ANY AND ALL ASSOCIATED COSTS IN BID. CONTRACTOR SHALL MAINTAIN/REPAIR ANY SERVICES MEANT TO REMAIN. COORDINATE WITH SERVING UTILITY COMPANY.

Roy testified that because Endsley Electric failed to remove and relocate the power lines, "the school district took that over themselves and had Bowie Cass perform the work and deducted [$31,890.00] from" its payment to Altech. Karen testified that the $31,890.00 was an additional expense that resulted from PGISD changing the contractual requirements through a change order. She testified that under the contract Endsley Electric bid on, the electrical lines

---

[12]Endsley Electric does not dispute that it, as a corporate entity, is liable for the $59,333.83 in damages.

16

were to be removed and raised, but that the change order altered the requirements to require that the power lines be moved and rerouted underground.

The change order documents before this Court, included in the record as Exhibit 8, do not specify what specific changes are being made to the contract, other than changing what amount PGISD is paying Altech. The letter states, in relevant part:

> The change order addresses the requirement for the overhead power line, located on the north side of the building running west to east and identified on Drawing Sheet ME1.1. The Electrical Note E2 states that the Contractor shall coordinate the removal of existing overhead primary and secondary power.

> The amount of $31,890.00 represented in Change Order Number Five is the total cost proposed from Bowie-Cass Electric Cooperative to relocate the power line overhead around the south side of the developed site area.

The change order documents note that the contract sum to be paid to Altech will be decreased by $31,890.00, and the reduction is explained as an "[o]wner's expense to relocate overhead electrical service from north side of the Intermediate School as required by the construction documents."

The specific portion of the construction drawings and specifications states that Endsley Electric is to coordinate the *removal* of the power lines and includes that cost in its bid. There is neither written contractual requirements nor construction drawings in the record indicating that Endsley Electric agreed to relocate and reroute (including from overhead to underground) the power lines. While the subcontract makes clear that Endsley Electric is to perform all electrical work, that requirement is not a blank check, but rather the subcontractor's responsibilities are limited to those stated in the contract documents. Even though there is a change order regarding the power lines, the change order documents fail to explain exactly what change is being made

17

other than decreasing Altech's contractual compensation by $31,890.00 due to PGISD paying that amount to a utility service provider. Based on the foregoing, we find that there is legally insufficient evidence that Endsley Electric is liable for the $31,890.00 portion of the damages awarded. Accordingly, we sustain this point of error, reverse the damage award of $91,223.83, and render a damage award of $59,333.83 in favor of Altech.

## VI.    Segregation of Attorney's Fees

The judgment awarded Altech $7,961.00 in attorney's fees. In its fourth point of error, Endsley Electric contends the evidence supporting the attorney's fee award is legally and factually insufficient because the testifying attorney failed to segregate the attorney's fees accrued under Altech's breach of contract claim and those accrued under its negligence claim.

Whether segregation is necessary is a question of law, subject to de novo review. *Penhollow Custom Homes*, *LLC v. Kim*, 320 S.W.3d 366, 374 (Tex. App.—El Paso 2010, no pet.).

Texas law prohibits recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I*, *L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). A negligence cause of action does not support a claim of attorney's fees, whereas a claim for breach of contract does. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001–.006 (West 2008).

If any attorney's fees relate solely to claims for which fees are not recoverable, a claimant must segregate recoverable from unrecoverable fees. *Tony Gullo Motors*, 212 S.W.3d at 313. Intertwined facts do not make tort fees recoverable. *Id.* at 313–14. It is only when legal services advance both recoverable and unrecoverable claims and the services are so intertwined that the associated fees need not be segregated. *A.G. Edwards & Sons*, *Inc. v. Beyer*, 235 S.W.3d 704,

710 (Tex. 2007) (vacated by settlement) (citing *Tony Gullo Motors*, 212 S.W.3d at 313–14). Because unsegregated fees are some evidence of what the segregated amount should be, remand for segregation of fees may be required when at least some of the fees at issue are attributable to claims for which attorney's fees are recoverable.

In *Allan v. Nerseova*, Allan pleaded thirteen claims against five defendants. 307 S.W.3d 564, 573 (Tex. App.—Dallas 2010, no pet.). At trial, Allan asserted only one cause of action against one defendant for which attorney's fees could be awarded. *Id.* Allan argued that she had no burden to segregate her fees because the tort and contract claims required proof of the same set of facts and circumstances and were intertwined to the point of being inseparable. The court of appeals noted that Allan failed to show that all her attorney's fees were incurred for legal services involving the breach of contract action. *Id.* "For example, the fees incurred in drafting the original and amended petitions and the jury charge relating to the tort claims were not recoverable, while the portion of the fees relating to the contract claim was recoverable." *Id.* at 573. Based on these findings, the court of appeals reversed the attorney's fee award and remanded the case for a new trial on the issue of attorney's fees. *Id.* at 573–74.

Here, it is undisputed that Altech pled two causes of action and that only one of those causes of action was eligible for attorney's fees. It is also undisputed that Altech failed to segregate its attorney's fees. As the Texas Supreme Court indicated in *Tony Gullo Motors*, an attorney's opinion testimony that "95 percent of their drafting time would have been necessary even if there had been no [unrecoverable] claim" will suffice as segregation, thereby leaving the court of appeals to apply the factual and legal sufficiency standard to the evidence. *Tony Gullo Motors*, 212 S.W.3d at 314. In this case, there is no testimony or other evidence that all, none, or

any portion of the attorney's time and expenses would have been necessary even if there had been no negligence claim. Therefore, we must reverse the trial court's award of attorney's fees and remand the case for another determination of attorney's fees.

Further, since we have found the evidence insufficient to uphold the judgment for $31,890.00, we cannot determine if the erroneous damage award affected the trial court's determination of attorney's fees. *Young v. Qualls*, 223 S.W.3d 312 (Tex. 2007); *Barker v. Eckman*, 213 S.W.3d 306, 314–15 (Tex. 2006).

## VII. Conclusion

We find that there is legally insufficient evidence that Endsley Electric is liable for the $31,890.00 of the damages awarded. Therefore, we sustain this point of error, reverse the damage award of $91,223.83, and render a damage award of $59,333.83 in favor of Altech. The judgments against Karen and Brad, individually, are reversed and judgment is rendered that Altech take nothing against the two individuals. The judgment for attorney's fees is remanded to the trial court for further proceedings consistent with this opinion.

Jack Carter
Justice

Date Submitted:     July 19, 2012
Date Decided:       August 7 , 2012

20