

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00040-CV

_____

TILLERD ARDEAN SMITH, MEDALLION TRANSPORT & LOGISTICS, LLC, AND
TOMY RUSHING D/B/A RUSHING TRANSPORT SERVICES, INC., Appellants

V.

BRANDI WILLIAMS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 12-0889

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

It was pre-dawn April 4, 2011, near Lone Star, Texas. Tillerd Ardean Smith was operating on only about three hours of sleep and was admittedly tired. He was driving a tractor-trailer rig belonging to Tomy Rushing (Rushing), d/b/a Rushing Transport Services, Inc., carrying cargo for Medallion Transport and Logistics, LLC (Medallion Transport), which had leased the truck.[1] Around 11:00 p.m. the evening before, having progressed only part way through his intended route from Kilgore, Texas, to Arkansas, Smith had stopped near Lone Star because of mechanical difficulty with the truck's brakes, which had been repaired by Rushing as Smith slept in the truck's sleeping berth. Smith drove south on U.S. Highway 259 toward an impromptu breakfast with Rushing. But Smith missed his turn and started looking for a way to get back on track.

Meanwhile, Brandi Williams Turnage[2] (Williams) was also driving south on U.S. Highway 259 toward her job as a registered nurse at a Longview hospital. Unfortunately, as Williams approached Smith from behind, Smith began a U-turn outside the south gate of U.S. Steel's plant south of Lone Star. Williams was injured in the resulting collision;[3] sued Smith, Rushing, and

---

[1]Smith has driven commercial trucks for over fifteen years and has driven for Rushing for over twelve years. He was also a qualified driver for Medallion Transport.

[2]At the time of the accident, Williams was married and went by the last name of Williams. Before the trial date, she had divorced and retaken her maiden name, Turnage.

[3]There are disputes concerning details of the accident, such as the location and speed of Smith's truck and the location of Williams' vehicle, but they are not germane to this appeal. At trial, Smith agreed that he may have had three hours of sleep and that it is unsafe to drive a truck and make a U-turn when fatigued. Nevertheless, he maintained that he was going below five miles per hour at the time, that the impact occurred in between the southbound outside lane and the dedicated right turn lane, and that Williams could have avoided the accident but for her speed. Williams was initially diagnosed with a strain to her cervical spine, hip contusion, knee contusion, scratches, facial scratches, and a dental fracture. A few days after the accident, she began complaining of pain in her lower back and was eventually diagnosed with an internally disrupted disc at L4-L5.

2

Medallion Transport; and received a judgment against all three defendants for over $3.8 Million.[4]

All defendants appeal.[5]

We reverse and remand the judgments against Smith and Medallion Transport, reverse the judgment against Rushing, and render a take-nothing judgment in Rushing's favor, because (1) giving the spoliation jury instruction was harmful error, and (2) judgment against Rushing is not supported by a jury finding or conclusive evidence; additionally, (3) sufficient evidence supported the jury findings on Williams' future damages, and (4) our holdings moot other issues before us.

---

[4]A three-question charge was submitted to the jury. Question No. 1 asked: "Did the negligence, if any, of those named below proximately cause the occurrence or injury in question?" and listed Williams and each of the Appellants. Question No. 2 asked the jury to assign percentages of responsibility for those it found caused the occurrence or injury and listed Williams and each of the Appellants. Question No. 3 asked the jury to award damages for Williams' injuries, if any, and listed twelve categories of possible past and future damages. In response to Question No. 1, the jury found that the negligence of Smith and Medallion Transport proximately caused the occurrence or injury, but that the negligence of Rushing and Williams did not. Under Question No. 2, the jury assigned Smith fifty-five percent and Medallion Transport forty-five percent of the responsibility. It also found the following damages:

| | |
|---|---|
| Past medical expenses | $ 142,351.00 |
| Future medical expenses | $ 350,000.00 |
| Lost wages (past) | $ 101,739.00 |
| Lost wages (future) | $1,471,011.00 |
| Physical pain and suffering (past) | $ 200,000.00 |
| Physical pain and suffering (future) | $ 300,000.00 |
| Mental anguish (past) | $ 300,000.00 |
| Mental anguish (future) | $ 250,000.00 |
| Physical impairment (past) | $ 250,000.00 |
| Physical impairment (future) | $ 500,000.00 |
| Disfigurement (past) | $ 0.00 |
| Disfigurement (future) | $ 0.00 |

No issue asked the jury whether, at the time of the accident, Smith was acting as an employee of either Rushing or Medallion Transport or whether he was then acting in the course and scope of any particular employment. Based on the verdict, the trial court entered judgment jointly and severally against all three Appellants for the sum of $3,865,101.00, plus prejudgment interest of $117,384.33 and court costs. Appellants filed a motion for new trial, for remittitur, and to modify judgment and a motion for judgment notwithstanding the verdict, all to no avail.

[5]When referring to Smith, Rushing, and Medallion Transport as a group, we will refer to them as "Appellants."

*(1)    Giving a Spoliation Jury Instruction Was Harmful Error*

Shortly after the accident, Medallion Transport received a letter, dated April 7, 2011, from attorneys representing Williams notifying it of their representation and advising Medallion Transport that they needed to inspect "the following documents:

1.    Driver's daily logs.

2.    Any notes kept by your driver pertaining to the miles driven, routes driven, stops made, loads, or other information regarding his driving.

.  .  .  .

10.    All daily route reports, driver inspection reports, load manifest, and fuel purchase receipts pertaining to the movement of cargo by the driver.

.  .  .  .

12.    All trip and/or operational documents pertaining to the movement of cargo by the driver."

.  .  .  .

The letter warned Medallion Transport that, if it were to (or if it allowed someone else to) "alter, lose, or destroy any of [the listed documents] before granting [Williams] access to this evidence, [it would] subject [itself] to prosecution for spoliation of evidence, judicial sanctions, and/or other adverse judicial actions or instructions at trial." By letter dated April 18, 2011, Medallion Transport's insurance carrier advised it to preserve the evidence requested by the attorneys and provided an additional sheet titled "Proposed 'Industry-wide' Post-Accident Preservation List." This list included the latest eight days of logs, the dispatch records, the fuel records, and the latest eight days of fuel records. After responding to the April 7 letter, Medallion Transport received no further communication from any attorney representing Williams and closed its claim file

4

January 31, 2012. This suit was filed October 19, 2012, by Williams' trial counsel.[6] After filing suit, Williams requested production of Smith's logs, dispatch records, and waybills (also known as bills of lading) from March 1, 2011, to April 4, 2011.[7] Medallion Transport produced Smith's logs for March 18 through April 4, 2011; waybills for March 1 through March 31, 2011; and dispatch records for April 6, 2010, through March 31, 2011.

We understand Williams' pretrial motion for sanctions for spoliation to complain of logs missing March 1 through March 17, 2011,[8] and the missing waybills and dispatch records for April 1 through April 4, 2011. She argued that Medallion Transport had a duty to preserve Smith's logs for six months before the accident pursuant to Department of Transportation (DOT) regulations[9] and that the April 7 letter from her then counsel and the subsequent letter from its insurance company gave Medallion Transport notice to preserve the relevant logs, waybills, and dispatch records. She went on to assert that Medallion Transport intentionally destroyed the missing documents, pointing to the deposition testimony of Cathy McMullen, who worked as an agent dispatcher for Medallion Transport. In her deposition, McMullen testified that she receives the

[6]Sometime between April 7, 2011, and October 19, 2012, Williams apparently retained different counsel.

[7]Although plaintiff's first request for production requested Smith's logs and waybills for a period of twelve months before the accident and plaintiff's second request for production requested dispatch records for thirty days before and including the date of the accident, Williams' motion for sanctions for spoliation of evidence asserts it requested these documents for the period of March 1, 2011, to April 4, 2011.

[8]Williams' motion complains of missing logs from March 1 to March 20, 2011, but the copies of logs attached to her motion show log entries for March 18 through April 4, 2011.

[9]DOT regulations require a motor carrier to maintain records of duty status (logs) and "all supporting documents" for each of its drivers "for a period of six months from the date of receipt." 49 CFR § 395.8(k)(1) (2014). Williams does not cite any authority that requires the motor carrier to maintain the logs of its driver in excess of six months if the driver is involved in an accident.

5

logs and waybills from the drivers, scans them, and sends them to Medallion Transport's corporate offices. She keeps the hard copies for one year and then throws them away. She testified that she would have done the same for any logs and waybills from the date of the accident since she assumed Medallion Transport would have the scanned copy.[10] Williams pointed out that, if McMullen kept any waybills and dispatch records for a year, then she would have destroyed them after the suit was filed. Williams also pointed to the deposition testimony of Bill Winney, chief operating officer for Medallion Transport, who testified that, if McMullen had scanned Smith's logs, waybills, and dispatch records, Medallion Transport should have retained them. Williams argued that the missing waybills and dispatch records from April 1 through April 4, 2011, and the missing logs from March 1 through March 17 prejudiced her because she was prevented from (1) verifying the accuracy of the logs on the days leading up to the accident, (2) verifying whether Smith was complying with the service hours restrictions in the March 1 through March 17 period, and (3) showing that Smith was fatigued on the day of the accident. At the pretrial hearing, Williams complained of her inability to show that Smith was driving in violation of service hours restrictions, that he had a "history of falsifying his logs all the way through March," and that he was fatigued on the day of the accident. When asked what other evidence there was of driver fatigue, Williams responded that Smith testified he began driving at 5:30 a.m. after two or three hours of sleep and pointed to inconsistencies in his log-book entries on the day of the accident.

---

[10]Apparently the logs for April 1 through April 4 had not been produced by the time of McMullen's and Till Winney's depositions, but had been produced sometime prior to the pretrial hearing.

Medallion Transport responded that the evidence showed that Williams failed to pursue her claim for over nine and one-half months, resulting in the closure of the claim file, and that there was no evidence of intentional or negligent destruction of documents. Rather, it argued that Medallion Transport preserved the documents identified in the April 7 letter and that the evidence shows only that the dispatch records and waybills for April 1 to April 4 were not in existence, not that they had been destroyed. Since McMullen was an independent contractor who was a non-party to the suit, Medallion Transport argued, any destruction of documents by her could not be the basis of a finding of intentional destruction of documents by Medallion Transport. After the pretrial hearing, the trial court granted Williams' motion, finding that Medallion Transport had intentionally destroyed or not produced the dispatch records and waybills for April 1 to April 4 and "selective days"[11] of Smith's logs and ordering that it would give a spoliation instruction.[12]

At trial, additional evidence relating to spoliation of evidence was heard by the jury. One of the themes of Williams' questioning of defense witnesses was to emphasize her theories that Medallion Transport was hiding evidence from the jury, that it "destroyed" the missing documents because they would have shown Smith was fatigued on the day of the accident, and that Smith had a pattern of driving in a fatigued state. For instance, during the questioning of Smith, the following exchange took place:

---

[11]Since Williams only complained about the non-production of logs from March 1 to March 17, we assume for the purposes of this appeal that the trial court was referring to these days.

[12]In defense of the trial court, when this trial took place, just how trial courts were to handle allegations of spoliation had not been finally settled. After this trial occurred, the Texas Supreme Court issued its ruling in *Brookshire Brothers, Ltd. v. Aldridge*, 438 S.W.3d 9 (Tex. 2014), to which reference is made hereafter. *Brookshire Bros.* clarified the course of action trial courts are to take when faced with claims of spoliation, previously a rather murky undertaking.

> Q Okay. So when we look at the dates, interesting enough, because what I've done here is I've tracked all of the records. We have no dispatch records, no waybills for the 1st, 2nd, 3rd, or 4th. Are you aware of that?
>
> A No.
>
> Q The only thing we have are the log books. Now, you agree with me that there's no way that I can check the accuracy of your log books because they didn't give us the dispatch records and the waybills for the 1st, 2nd, 3rd, or 4th, correct?
>
> A If you say so. I don't know. I don't know nothing about that.
>
> . . . .
>
> Q So if they [Medallion Transport] don't get them to us, then I can't bring them to this jury to show how many hours you were working on these days to verify, correct?
>
> A Okay. Correct.
>
> . . . .
>
> Q Okay. So -- you know, so if there's log books that say you're not working, and guess what, you are working, that sheds a little light on maybe why I didn't get the dispatch records and the waybills on the 1st, 2nd, 3rd, and 4th, correct?
>
> A Correct.

Williams also examined Winney extensively about the April 7 letter; DOT regulations; and the missing logs, waybills, and dispatch records, seeking to show Medallion Transport's malicious-intent in failing to produce these documents. In her examination of McMullen, Williams also emphasized the missing documents, including the following:

> Q All right. Are you aware that[,] if you get a letter from a law firm that says, hold on to documents, or don't destroy, do you understand what that means?
>
> A Yes, sir.

8

Q    All right. And would you not destroy those records if you got that letter?

A    No, sir.

Q    Right. And then if you got a letter from within the company that said, don't destroy these records, because if you destroy these records, it's going to be shown to a jury that you've done it because you're trying to hide something, you'd save those records too, wouldn't you?

A    Yes, sir.

Medallion Transport also explained why the documents were not produced. Regarding the logs for March 1 through March 17, Winney explained that logs are kept in the regular course of business for six months as required by the DOT. He said that, when a driver is involved in an accident, Medallion Transport normally preserves the driver's logs for the date of the accident and the seven days before the accident, which is what it did in this case. He acknowledged receiving the April 7 letter, but he did not understand that letter to require him to keep all of the logs for six months before the accident. Rather, he kept the logs of the day of the accident and the week prior, which is common practice in the industry. Therefore, at the end of six months, the other logs would have been destroyed in the regular course of business. Regarding the dispatch records and waybills for April 1 to April 4, Winney testified that Medallion Transport keeps waybills for two years as required by the Internal Revenue Service, and it keeps dispatch records "forever." Both Smith and Winney testified that there were no waybills for April 1 because that would have been the delivery date for the load Smith picked up March 31.[13] Therefore, the waybill produced for

---

[13]Smith explained that the driver receives the waybill when he picks up a load. The waybill shows the identity of the shipper, the city of origin of the shipment, the identity of the consignee, and the city of the delivery of the shipment.

March 31 would also cover April 1. Smith did not work April 2, so there would not be a waybill for that date. Smith picked up a load and waybill April 3 but, after the accident, gave the waybill to Rushing. Rushing testified that he contacted another trucking company, 5J Transportation, to deliver the load Smith had been transporting and gave the waybill to the driver. Since Medallion Transport did not deliver the load, it did not receive the waybill. Therefore, Medallion Transport never had a waybill for April 3 and 4. In his deposition, Winney testified that, if Smith hauled a load for Medallion Transport, there should be a dispatch record. However, at trial, he explained that the dispatch record is derived from information taken from the waybills.[14] He stated that since Medallion Transport did not have a waybill for April 3 or 4, there was no information to input, so there were no dispatch records for those dates.

At trial, using the waybills and dispatch records produced for March, Williams was able to demonstrate that Smith had falsified his log for at least one day in March. On March 24, Smith's log indicates that he was off duty all that day. However, the dispatch records and waybill for that date showed he picked up a load in Kilgore, Texas, to be delivered to Amarillo, Texas. Smith, Winney, and Rushing all admitted that this meant that Smith had falsified his log for March 24. Smith agreed that, since the trip to Amarillo was at least eight hours one way, this meant that Smith either falsified his log for either March 23 or 25, which showed he was also off duty those days,

_____

At the end of his run, he would turn his logs and waybills in to McMullen. If he does not work one day, then no waybill would be created for him that day.

[14]This was the only explanation of dispatch records and how they are generated. Although not entirely clear, it appears that for each driver, information regarding the identity of the shipper, shipper location, ship date, destination, delivery date, and waybill number are taken from individual waybill and input into a computer program to generate a "dispatch summary" for the driver.

10

or he drove in excess of the maximum hours allowed on March 24. He agreed that, if he made the trip all on March 24, it would be an instance in which he was driving while fatigued. Also, Williams was able to attack the credibility of Smith's logs for April 3 and 4, showing that Smith had failed to record the breakdown of his truck, failed to record the repair and secure the signature of the mechanic, and failed to do a pre-trip inspection of the truck after the repair. Smith admitted that all of these were required to be recorded in the log and that it was possible that he failed to do these things because he was up all night and was fatigued.

After both parties rested, Medallion Transport asked the trial court to reconsider its spoliation finding, pointing to the evidence that all of the waybills and dispatch records for April 1 to April 4 had either been produced, never existed, or were not in the possession of Medallion Transport. In addition, Medallion Transport argued that the April 7 letter provided no time frame for the preservation of documents, that the logs from March 1 through March 17 were too remote to be probative on the issue of fatigue on the date of the accident, and that Williams had suffered no prejudice since the documents produced were more than sufficient for her to carry her case. Williams asserted certain inconsistencies in the trial and deposition testimony of McMullen. The trial court overruled Medallion Transport's motion and included the following instruction in the jury charge:

> THE COURT has found that Medallion Transport Logistics, LLC[,] intentionally withheld documents or destroyed evidence material to this case. Specifically, Medallion Transport Logistics, LLC[,] intentionally withheld or destroyed the dispatch records and waybills for the days of April 1, 2011[,] to April 4, 2011, along with selective days of Tillerd Smith's driver logbook. You should presume that this evidence would have been unfavorable to Medallion Transport Logistics, LLC[,] if it had been produced.

11

During the charge conference, Appellants[15] objected to the spoliation instruction, arguing first that "the evidence does not support [a finding] that Medallion Transport intentionally withheld documents or destroyed evidence material to this case" and that the instruction was a comment on the weight of the evidence. The trial court overruled these objections.

In this Court, the Appellants first assert that the trial court abused its discretion in allowing the jury to hear spoliation evidence and in giving a spoliation instruction to the jury. A trial court's submission of a spoliation instruction to the jury is reviewed under an abuse-of-discretion standard. *Brookshire Bros.*, 438 S.W.3d at 27; *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003). A trial court's admission of spoliation evidence is likewise reviewed for abuse of discretion. *Brookshire Bros.*, 438 S.W.3d at 27. To determine the propriety of the trial court's actions, we use the framework articulated by the Texas Supreme Court in *Brookshire Bros. Petroleum Solutions, Inc. v. Head*, 454 S.W.3d 482, 488 (Tex. 2014); *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 918 (Tex. 2015); *see Brookshire Bros.*, 438 S.W.3d at 19–22. If we find an abuse of discretion, the error is reversible only if it "'probably caused the rendition of an improper judgment.'" *Brookshire Bros.*, 438 S.W.3d at 29 (quoting TEX. R. APP. P. 61.1(a)).

[15]Williams, in her brief and at oral argument, claimed that, because the spoliation instruction refers only to Medallion Transport, it can cause reversal, even if erroneous, only as to Medallion Transport, not Smith. Yet, all Appellants were represented by the same counsel, at trial and on appeal. Though Appellants' brief states that the motion for reconsideration was made by Medallion Transport, the objections to neither the charge nor the spoliation instruction were limited to Medallion Transport. Although there are places in which Appellants seem to limit their arguments, in this connection, to Medallion Transport, they certainly make a broader claim: "[T]he court's actions undoubtedly prejudiced Medallion and Smith on both liability and damages and led to a judgment based on improper reasons." Also, Appellants argue there was an abuse of discretion in giving the instruction, but do not limit their argument only to Medallion Transport. Unless so limited by counsel, we assume the objection to the spoliation instruction was made on behalf of all Appellants. Furthermore, Williams did not limit her focus at trial to only Medallion Transport, but argued and presented evidence on the spoliation issue broadly against all Appellants. Thus, our review of the prejudicial effect of the spoliation instruction cannot be limited to Medallion Transport, and reversal is not limited to that Appellant.

Under this legal framework, it is the trial court, not the jury, that "must determine whether a party spoliated evidence and, if so, impose the appropriate remedy." *Brookshire Bros.*, 438 S.W.3d at 20. Since "the trial court bears this responsibility, evidence of the circumstances surrounding alleged spoliation is generally inadmissible at trial, as such evidence is largely irrelevant to the merits and unfairly prejudicial to the spoliating party." *Petroleum Solutions*, 454 S.W.3d at 488 (citing *Brookshire Bros.*, 438 S.W.3d at 26).[16] In order to find that spoliation has occurred, the trial court must determine first that (1) the party failing to produce evidence had a duty to preserve the evidence and (2) that it "breached its duty to reasonably preserve material and relevant evidence." *Id.* (citing *Brookshire Bros.*, 438 S.W.3d at 20); *Wal-Mart Stores*, 106 S.W.3d at 722. Further, a duty to preserve evidence arises only when "a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." *Brookshire Bros.*, 438 S.W.3d at 20 (quoting *Wal-Mart Stores*, 106 S.W.3d at 722).

If the trial court finds that spoliation has occurred, it must again exercise its discretion in imposing a remedy. To determine the appropriate remedy, the trial court should weigh both the culpability of the spoliating party and the prejudice to the other party. *Id.* at 21. To evaluate prejudice, we are to consider

> the relevance of the spoliated evidence to key issues in the case, the harmful effect of the evidence on the spoliating party's case (or, conversely, whether the evidence would have been helpful to the nonspoliating party's case), and whether the

---

[16]In this regard, the Texas Supreme Court noted, "[T]here is no basis on which to allow the jury to hear evidence that is unrelated to the merits of the case, but serves only to highlight the spoliating party's breach and culpability. While such evidence may be central to the trial court's spoliation findings, it has no bearing on the issues to be resolved by the jury." *Brookshire Bros.*, 438 S.W.3d at 26–27.

13

> spoliated evidence was cumulative of other competent evidence that may be used instead of the spoliated evidence.

*Id.* at 21–22 (citing *Trevino v. Ortega*, 969 S.W.2d 950, 958 (Tex. 1998) (Baker, J., concurring). Further, "a trial court may submit a spoliation instruction only if it finds (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the nonspoliating party to be irreparably deprived of any meaningful ability to present a claim or defense."[17] *Petroleum Solutions*, 454 S.W.3d at 489 (citing *Brookshire Bros.*, 438 S.W.3d at 23–26). Because the giving of a spoliation instruction "can shift the focus of the case from the merits of the lawsuit to the improper conduct that was allegedly committed by one of the parties" and "be tantamount to a death-penalty sanction," the Texas Supreme Court clarified that intentional spoliation means "that the party acted with the subjective purpose of concealing or destroying discoverable evidence." *Brookshire Bros.*, 438 S.W.3d at 13, 23–24.

Relying on *Brookshire Brothers*, Appellants argue that there is no evidence that Medallion Transport or any person under its control intentionally destroyed relevant and material evidence with the purpose of concealing relevant evidence, that it preserved and produced more documents than were originally requested in the April 7 letter and the letter from its insurer, and that a reasonable explanation was given for the absence of any documents. In addition, Appellants point out that any missing documents did not prevent Williams from showing that Smith falsified his logs, violated the maximum service hours, and was fatigued at the time of the accident, all of which she was able to show using the documents produced by Medallion Transport. Finally, Appellants

---

[17]In this case, the trial court found that Medallion Transport intentionally spoliated evidence.

14

argue that the logs from March 1 to March 17 were too distant to be material and relevant to the issue of whether Smith was fatigued on April 4, which was the "essential theory of Williams' case."

Williams points out that the trial court conducted an initial hearing before trial in which it considered her motion for sanctions. She argues that the trial court considered the evidence, determined that Medallion Transport had breached its duty to preserve relevant and material evidence, and properly fashioned an appropriate remedy after it considered the "essential theory" of Williams' case: that Smith was fatigued at the time of the accident. In support of the trial court's finding that Medallion Transport "intentionally concealed or destroyed evidence material to the case," Williams points primarily to McMullen's deposition testimony. Regarding the missing March 1 to March 17 logs and the missing waybills and dispatch records for April 1 to April 4, Williams claims McMullen testified "that she scanned the records and sent them to Medallion Transport" and "that after a year she threw the originals away." Williams asserts also that "Medallion Transport provided no other explanation for what happened to the records."

If the only evidence the trial court had before it was the evidence it had at the pretrial hearing, then our analysis might be quite different. In this case, however, the trial court admitted evidence related to spoliation, as well as testimony explaining the absence of the evidence, at trial. In addition, as has been seen, Williams put on substantial evidence of Smith's admitted fatigue at the time of the accident. At the end of testimony, the trial court was asked twice to reconsider giving the spoliation instruction. This additional evidence is relevant to both the trial court's

15

determination that Medallion Transport had intentionally spoliated evidence and its ruling on the appropriate remedy.

The Texas Supreme Court's analysis in *Brookshire Bros.* controls our disposition of this case. In that case, Aldridge slipped and fell about fifteen feet from a "Grab N Go" containing rotisserie chickens that were cooked and packaged in the store's deli. *Id.* at 15. At the time of the fall, he did not report it to store employees. However, about an hour and a half later, he went to the emergency room because of pain. Five days later, Aldridge returned to the store and reported his injuries. An incident report was prepared based on Aldridge's statement and the recollections of the assistant manager on duty at the time of the fall, which stated that Aldridge had slipped on grease on the floor near the "Grab N Go" area. *Id.* Aldridge's fall was captured by a surveillance camera mounted near the check-out counters. However, the floor where he fell was in the background and obscured by a display table. After Aldridge reported the fall, Robert Gilmer, Brookshire Brothers' Vice President of Human Resources and Risk Management, retained and copied about eight minutes of the surveillance footage, covering the time from when Aldridge entered the store to his fall. At the time of the fall, the surveillance video was recorded in a continuous loop that recorded over prior events after approximately thirty days. *Id.* Less than two weeks after the fall, Aldridge requested a copy of the video footage of the incident, but Gilmer testified he instructed the claims department not to provide the recording to Aldridge because he believed it would be improper. Aldridge was advised by letter shortly thereafter that the claims department could not provide him a copy. Within a few more weeks, the surveillance video (except the copy of the eight-minute segment) was presumably recorded over. *Id.* Approximately one

16

year later, Aldridge's attorney requested an additional two and a half hours of footage from the video, and Brookshire Brothers was unable to comply because the footage had been recorded over at least ten months earlier. *Id.*

Aldridge filed suit and argued that Brookshire Brothers' failure to preserve additional video footage amounted to spoliation and that the missing evidence was relevant to the key issue of whether the spill was on the floor long enough to give Brookshire Brothers a reasonable opportunity to discover it. *Id.* at 15–16. Aldridge asked for a spoliation jury instruction. The trial court, after allowing the jury to hear evidence bearing on whether Brookshire Brothers spoliated the video recording, submitted a spoliation instruction to the jury and permitted the jury to decide whether spoliation occurred. *Id.* at 16. At trial, Gilmer testified that he had instructed his manager trainee to save the portion of the video showing the fall and the five or six minutes before to identify Aldridge entering the store. He did not believe the rest of the video would be relevant, even though he understood that the key issue in a slip-and-fall case is frequently whether store employees knew or should have known there was something on the floor. He also testified that, when the decision was made to preserve the video, he did not know that there was going to be a lawsuit. *Id.*

Applying the framework discussed above to the facts before it, the Texas Supreme Court held that both the admission of the spoliation evidence and the giving of a spoliation instruction were improper. *Id.* at 27. The Court assumed, without deciding, that Brookshire Brothers had breached its duty to reasonably preserve evidence by allowing the additional footage to be overwritten. Nevertheless, the Court held that the trial court abused its discretion in submitting a

17

spoliation instruction because there was no evidence that Brookshire Brothers "did so with the requisite intent to conceal or destroy relevant evidence or that Aldridge was irreparably deprived of any meaningful ability to present his claim." *Id.* The Court pointed out that the testimony was that more footage was not retained because it was not thought relevant. Further, although Aldridge requested a copy of the video of the fall, he did not request additional footage. Although additional footage was requested after suit was filed a year later, the Court noted that there was no evidence that the footage was still available at the time of the additional request. *Id.* Further, there was no indication that the decision as to what footage to save was in any way based on what the additional footage would have shown. Therefore, the Court found "simply no evidence that Brookshire Bros. saved the amount of footage that it did in a purposeful effort to conceal relevant evidence." *Id.* at 28.

We have a similar situation in this case. First, the only evidence regarding the "missing" waybills and dispatch records from April 1 to April 4 shows (1) that the waybill for April 1, and the dispatch record derived from it, was a continuation of the one from March 31, which was produced, (2) that since Smith did not work on April 2, no waybill or dispatch record ever existed for that day, (3) that the waybill for April 3 through April 4 was not in the possession of Medallion Transport since another carrier finished the delivery after the accident, and (4) that without a waybill, no dispatch record was ever generated.

The only other missing documents addressed in the spoliation instruction are the logs from March 1 to March 17. Assuming, without deciding, that this evidence was relevant and material and that Medallion Transport had a duty to reasonably preserve it and breached that duty by

18

allowing the logs from March 1 to March 17 to be destroyed, there is no evidence that Medallion Transport did so with the requisite intent to conceal or destroy relevant evidence. The evidence shows that Medallion Transport preserved logs for the day of, and for seventeen days before, the accident. This exceeds the eight days suggested by its insurance company and Medallion Transport's regular practice of preserving seven days' logs when a driver is involved in an accident. Although Medallion Transport acknowledged receiving the April 7 letter, that letter did not request a specific period of time for preserving the documents it identified. After Medallion Transport responded to that letter, it had no further request for any documents until approximately a year and a half later, when Williams requested logs from March 1 to April 4. However, this was well past the time that the logs would have been destroyed in the regular course of business, as testified to by Winney. There is no evidence that the logs for March 1 to March 17 were in existence at the time this request was made. Further, there is no evidence that these logs were destroyed because of their evidentiary value or that Medallion Transport allowed their destruction "in a purposeful effort to conceal relevant evidence." *Id.* Since the evidence required to find intentional spoliation is lacking, we find that giving the spoliation instruction ran afoul of *Brookshire Bros.*

Having found an abuse of discretion in giving the spoliation instruction, we may reverse the judgment on this basis only if giving the instruction "'probably caused the rendition of an improper judgment.'" *Brookshire Bros.*, 438 S.W.3d at 29 (quoting TEX. R. APP. P. 61.1(a)). The Texas Supreme Court has indicated that harm is likely.

> [A]n unnecessary spoliation instruction is particularly likely to cause harm.
> Because the instruction itself is given to compensate for the absence of evidence

19

> that a party had a duty to preserve, its very purpose is to "nudge" or "tilt" the jury. Thus, if a spoliation instruction should not have been given, the likelihood of harm from the erroneous instruction is substantial, particularly when the case is closely contested.

*Wal-Mart Stores*, 106 S.W.3d at 724. In *Brookshire Bros.*, the Court again emphasized that giving a spoliation instruction "can shift the focus of the case from the merits of the lawsuit to the improper conduct that was allegedly committed by one of the parties during the course of the litigation process" and that "this shift can unfairly skew a jury verdict, resulting in a judgment that is based not on the facts of the case, but on the conduct of the parties during or in anticipation of litigation." *Brookshire Bros.*, 438 S.W.3d at 13–14. Further, harm is compounded by the admission of improper evidence[18] and jury arguments on the spoliation issue. *Petroleum Solutions*, 454 S.W.3d at 490; *Brookshire Bros.*, 438 S.W.3d at 13–14, 29.

Also, the Texas Supreme Court has found harm when a spoliation instruction was given in error, even though no evidence of spoliation was introduced at trial. In *Gutierrez*, liability was closely contested in a suit resulting from a collision between a bus and an automobile. The bus was equipped with a camera, whose recording automatically looped over after 168 hours and erased the previous recording. *Gutierrez*, 453 S.W.3d at 918. The trial court found Wackenhut Corporation had negligently allowed the recording to be erased and submitted a spoliation instruction to the jury. *Id.* at 919. Although no evidence of the circumstance of spoliation was

---

[18]Appellants assert that the trial court committed "clear error" in admitting evidence of spoliation and appear to argue that they had no burden to object at trial to the admission of this evidence. Williams argues that Appellants failed to preserve this complaint as a separate point of error since they failed to object at trial. While we do not reach this complaint as a separate point of error, we nevertheless consider the admission of evidence of spoliation relevant to our harm analysis. *See Petroleum Solutions*, 454 S.W.3d at 490 (where evidence of spoliation admitted at trial, apparently without objection, held that "[t]he harm of [erroneously giving a spoliation instruction] . . . is compounded by improper presentation of evidence and argument to the jury on the spoliation issue").

admitted at trial, Gutierrez referenced the missing recording in his opening statement and placed significant emphasis on the spoliation instruction in his closing argument stressing it would have shown "who was telling the truth." *Id.* at 922. After finding that giving a spoliation instruction was an abuse of discretion, the Supreme Court found that it was also harmful, reasoning that, "[i]n light of the contested liability, counsel's statements, and the highly speculative probative value of the recording, the record reflects the significant effect the spoliation instruction likely had on the trial." *Id.*

Appellants argue that this was a hotly contested case both as to liability (at least as to proportionality) and damages, both of which hinged greatly on the credibility of the witnesses. They argue that the taint of spoliation caused by the instruction, the admission of evidence, and Williams' jury argument undermined the credibility of Smith and prejudiced the jury against Medallion Transport, causing the jury to apportion fault to these defendants, but none to Williams. Williams argues that any error regarding spoliation affected only Medallion Transport, and not Smith or Rushing, and was harmless since the jury found Smith fifty-five percent at fault and both Medallion Transport and Rushing vicariously liable for Smith's fault. However, at trial, Williams sought to cast the taint of spoliation on all of the defendants, not just Medallion Transport.

Like the plaintiff in *Gutierrez*, Williams stressed the missing documents both in her opening statement and closing argument. In her opening, she told the jury,

> Ladies and Gentlemen, the evidence is going to be very clear to you that the Defendants have destroyed documents.
> You know why they destroyed them? So I couldn't bring them here and show them to you so you could look at them and say: Yeah. Guess what? If [Williams' counsel] would have had these documents, he could have even proved more.

Then, in her closing argument, Williams heavily emphasized the spoliation instruction and the surrounding circumstances, which comprised about four pages in the reporter's record, including the following:

> Do you really think that somebody didn't look at those documents and not just send them to us? You know why they didn't send them to us? Because they knew, if the [sic] did, I was going to be able to prove that he was fatigued. They knew it.
> So they're like: Okay. If we send it, he's got us for sure. If we don't send it, guess what? We're just going to say we just made a mistake and destroyed it and the jury might have some question in their mind.
>
> . . . .
>
> Now, I submit to you, had they given me the stuff that the Court's already told you they didn't give me, that they destroyed because they didn't want me to have it from here to here, guess what? How much you bet I'd be able to prove other things? How much you bet I would have found a pattern?
> Again, goes back to their decision: We're not going to give him this stuff, because if we give him this stuff, then we can't make an argument that it's not true because he's got us.
> And, again, if you look over here, why would they give us some and not others? Why? Because they know the "other" is going to what? Shut the trap on them again.

In both her opening statement and closing argument, Williams sought to cast suspicion on all of the defendants, not just Medallion Transport. In addition, Williams examined Smith, Rushing, Winney, and McMullen about the missing documents, thereby casting on all defendants the suspicion that they were hiding damaging evidence. Further, Appellants sought to show that Williams was at least partially at fault in the accident and that she was exaggerating her injuries, both of which depended in part on the credibility of Smith. Since the spoliation instruction tends to "unfairly skew a jury verdict, resulting in a judgment that is based not on the facts of the case,

22

but on the conduct of the parties during or in anticipation of litigation," this is significant since the jury found no liability on the part of Williams. *Brookshire Bros.*, 438 S.W.3d at 13–14. There was some testimony that, if believed, would have supported a finding of some liability on Williams, which could have potentially affected the Appellants' joint and several liability. Since "an improper spoliation instruction presents a substantial likelihood of harm" and such harm is compounded by counsel's statements and arguments and by improper evidence, we find that the trial court's error probably caused the rendition of an improper judgment. *Petroleum Solutions*, 454 S.W.3d at 490; *Brookshire Bros.*, 438 S.W.3d at 29; *Gutierrez*, 453 S.W.3d at 922.

Accordingly, we sustain this point of error, reverse the trial court's judgment against Smith and Medallion Transport, and remand the case to the trial court for a new trial involving Smith, Medallion Transport, and Williams consistent with this opinion.[19] As discussed below, however, the judgment against Rushing will be reversed and rendered.

*(2)    Judgment Against Rushing Is Not Supported by a Jury Finding or Conclusive Evidence*

The jury found that no negligence on the part of Rushing proximately caused the occurrence or injury and assigned no percentage of responsibility to him. In addition, the jury charge did not contain any question asking whether Smith was the employee of Rushing, or, if so, whether Smith was in the course and scope of his employment at the time of the accident. Nevertheless, the trial court entered judgment against Rushing.

---

[19]Our reversal of the trial court's judgment against Medallion Transport makes moot its point of error complaining of the entry of a joint and several judgment against it, since the jury in the new trial will be required to determine what parties were responsible for the occurrence, as well as their percentage of responsibility.

23

Rushing asserts that the trial court erred in (1) disregarding the jury's answers finding that he did not proximately cause the occurrence or injury and (2) entering judgment against him. He argues that, since there was no motion and notice, as required by Rule 301 of the Texas Rules of Civil Procedure, the trial court could not disregard the jury answers. *See* TEX. R. CIV. P. 301. Further, even if there had been a motion and order, Rushing argues, the trial court could disregard the jury's answers only if either no evidence supported the answers or the issue was immaterial, neither of which applies to this case. As to joint and several liability, Rushing argues that entry of judgment violates Section 33.013(b)(1) of the Texas Civil Practice and Remedies Code, which requires a finding of liability greater than fifty percent and that no question was submitted to the jury establishing Rushing's vicarious liability. Williams responds that the trial court did not disregard the jury answers to Questions 1 and 2 since these inquired only as to Rushing's direct liability. She also argues that the record conclusively establishes that Smith was employed by Rushing, thereby making Rushing vicariously liable for Smith's acts committed in the course and scope of his employment. According to Williams, this was undisputed since Appellants were willing to stipulate to Rushing's vicarious liability.

Appellants point to no evidence in the record, and the record does not show, that the trial court entered its joint and several judgment against Rushing by disregarding the jury's answers to Questions 1 and 2, which concerned Rushing's direct liability. In her motion for judgment on the verdict, Williams asked for a joint and several judgment against all defendants "on the verdict." After Appellants filed a response opposing a joint and several judgment, Williams filed a reply to the opposition arguing that Rushing was jointly and severally liable based on his vicarious liability

24

as Smith's employer. Further, there is no indication in the judgment that the trial court disregarded any of the jury's answers. To the contrary, the judgment states, "The charge of the Court and the verdict of the jury are incorporated for all purposes by reference." Since Appellants have not shown in the record that the trial court disregarded the jury's answers, they have waived this argument. *See* TEX. R. APP. P 38.1(i).

Nevertheless, as Rushing points out, our proportionate responsibility statute allows a joint and several judgment to be entered against a party only if that party's percentage of responsibility is found to be greater than fifty percent. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 424 (Tex. 2011) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 33.013(b)(1) (West 2015)). Since the jury determined that Rushing had no direct responsibility, entry of a joint and several judgment against him on the basis of his direct responsibility would be in error. *Id.* However, a joint and several judgment could be entered against Rushing if he is vicariously liable for Smith's actions under a theory of respondeat superior. *See Pierre v. Swearingen*, 331 S.W.3d 150, 154–55 (Tex. App.—Dallas 2011, no pet.); *Bedford v. Moore*, 166 S.W.3d 454, 460–61 (Tex. App.—Fort Worth 2005, no pet.). The only theory Williams asserts to support the judgment against Rushing is that Smith was the employee of Rushing and acting in the course and scope of his employment at the time of the accident.

We must consider whether the judgment can be supported under a theory of *respondeat superior* in the absence of jury findings that Smith was Rushing's employee and that he was acting in the course and scope of his employment. "[I]f no element of an independent ground of recovery or defense is requested or submitted, that independent ground is waived unless it is conclusively

25

established." *J & C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 635 (Tex. App.—San Antonio 1993, no pet.) (citing TEX. R. CIV. P. 279). Recovery against Rushing for his vicarious liability under a theory of *respondeat superior* would be an independent ground of recovery. *Id.* "'A trial court is not authorized to make findings of fact pursuant to Rule 279 when the omitted issue is an independent ground of recovery and no issues referable to it were submitted to the jury.'" *Id.* (quoting *Tribble & Stephens Co. v. Consol. Servs., Inc.*, 744 S.W.2d 945, 951 (Tex. App.—San Antonio 1987, writ denied)). In this case, no issue concerning Smith's employment with Rushing, or any element referable to it, was submitted.[20] Williams had the burden to request a jury question regarding vicarious liability. *See Laredo Med. Grp. v. Jaimes*, 227 S.W.3d 170, 174 (Tex. App.—San Antonio 2007, pet. denied). Having failed to do so, to hold Rushing vicariously liable for Smith's actions, Williams became encumbered with a heavy burden.[21] Since his employment was in issue, Williams had to show first that Smith was in the service of Rushing with the understanding that Rushing had "the right to direct the details of his work and not merely the result to be accomplished" at the time of the accident. Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts & Workers' Compensation* PJC 10.1 (2014); *see Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002); *Salaiz*, 866 S.W.2d at 636. In addition, Williams had to conclusively show that

---

[20]Rushing properly preserved this error in his Motion for New Trial, For Remittitur, and to Modify the Judgment. *See Salaiz*, 866 S.W.2d at 636.

[21]Williams' First Amended Original Petition alleged that Rushing was the employer of Smith and that Smith was acting in the course and scope of that employment when the injury occurred. Rushing filed a general denial in Defendants' First Amended Original Answer, placing these allegations in issue. *See Salaiz*, 866 S.W.2d at 635; *see also City of Houston v. Wormley*, 623 S.W.2d 692 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).

Smith was acting within the course and scope of his employment. *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex. 1971); *see Salaiz*, 866 S.W.2d at 636. Unless the evidence conclusively establishes that Smith was Rushing's employee and that he was acting in the course and scope of his employment at the time of the accident, this theory of recovery was waived. *Salaiz*, 866 S.W.2d at 636; TEX. R. CIV. P. 279.

In this Court, Williams contends the testimony of Smith and Rushing conclusively shows Smith was Rushing's employee. Williams cites the following testimony of Smith:

Q   All right. And just backing up a minute here, you have worked for Tomy Rushing for some time, correct?

A   Correct.

Q   All right. And just so the record's clear, you're no longer working for Tomy Rushing, right?

A   Well, that could be -- I'm on-call, we'll put it that way. Every day, to answer your question, no. I don't work for him every day.

Q   All right . . . Just so we understand. Have you worked for him in the last week?

A   No.

Q   Have you worked for him in the last month?. . . In the last two months? . . .Three months? . . . In the last six months? . . . In the last year?

A   (to each question) No.

Q   Okay. But you're telling us that you still work for him sometimes if he calls you?

A   Yeah.

Q   Okay. All right. Do you work for Medallion Transport now?

27

A    I work for Tomy.

. . . .

(Video clip playing) (from deposition of Smith)

QUESTION:   The question is:  At any time you worked for Tomy Rushing, he at no time ever provided you any 18-wheeler trucking training, correct?

ANSWER:  Correct.

QUESTION:  No safety training whatsoever the entire time you've been employed with Mr. Rushing.  Correct?

ANSWER:  Correct.

QUESTION:    Entire time you've been employed with Rushing Transportation Services and/or Medallion Transport, neither of those groups has ever provided you with any training, correct?

ANSWER:  Correct.

QUESTION:  In fact, after this accident occurred, they still didn't provide you with any training on how to avoid accidents of this nature, correct?

ANSWER:  Correct.

(End of video clip.)

She also points to the following testimony of Rushing:

Q    And, Mr. Rushing, you're -- you're another one of the employers for Mr. Smith, correct?

A    Sir?

Q    You're another one of the employers for Mr. Smith, correct?

A    Yes.  He drives my trick [sic].

Q    Okay.

A He drove my truck, yes.

Q All right. Does he still work for you?

A On occasion, if we have to go get some hay or something like that, we'll go get some hay, but he -- it's just --

Q Sure.

A -- little bitty things like that.

Q Did he work for you last month?

A No, sir.

Q Has he worked the last couple of months?

A No, sir.

Q When's the last time he worked for you?

A I really couldn't tell you. It has been a while. Been over a year probably.

We have searched the record for other testimony by Smith and Rushing regarding their relationship on the day of the accident, in addition to that cited by Williams. Smith testified at one point that Rushing was his supervisor. He also testified that he "worked" for Rushing driving trucks over the last twelve or thirteen years. At most, this testimony is evidence that Smith has worked for Rushing at various times in the past as a truck driver, either as an employee or an independent contractor. None of this testimony conclusively establishes that Smith was acting as an employee of Rushing on the day of the accident. In addition, we could not find any testimony to show that Rushing had the right to direct Smith in his work. To the contrary, Smith testified that it was Medallion Transport's agent, McMullen, who dispatched him and told him where to go. He also

29

testified that he turned his log books in to McMullen. Although it is undisputed that Smith was driving a truck owned by Rushing at the time of the accident, this does not establish that he was acting in the service of Rushing or that Rushing had the right to direct the details of his work.[22] Since the evidence does not conclusively establish that Smith was acting as Rushing's employee at the time of the accident,[23] it was error to enter judgment against Rushing, unless there was an effective stipulation as to Rushing's vicarious liability.[24]

"A stipulation is an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys respecting some matter incident thereto." *Jaimes*, 227 S.W.3d at 174 (citing *Shepherd v. Ledford*, 962 S.W.2d 28, 33 (Tex. 1998)). "Stipulations are generally favored by trial courts as a way of expediting litigation and will normally be upheld unless good cause is shown for rejecting them." *Id.* (citing *Valero Eastex Pipeline Co. v. Jarvis*, 990 S.W.2d 852, 856 (Tex. App.—Tyler 1999, pet. denied)). However, the stipulation should be disregarded by the trial

---

[22]At the trial court, Williams asserted that the lease between Medallion Transport and Rushing established that Smith was an employee. However, the lease provides that Rushing will supply drivers who are his "employees or independent contractors" and that, as between Rushing and Medallion Transport, the "direction and control" of these employees or independent contractors "including the selection, hiring, discharge, supervision, direction, training, establishment of wages, hour[s,] and working conditions . . . is the exclusive responsibility of Rushing." Understandably, Williams has not pressed this point in this Court since she sought jury findings against Medallion Transport for its deficiencies in regard to selection, hiring, supervision, training and discharge.

[23]We also note that the undisputed testimony of Smith and Rushing shows that, at the time of the accident, Smith had deviated from his delivery route and was on his way to meet Rushing for breakfast. Smith had picked up his load in Kilgore and was heading toward Arkansas on U.S. Highway 259 when his truck had brake problems. This means he was heading in a northerly direction. Yet, at the time of the accident, Smith was heading south on Highway 259 and was attempting a U-turn because he had missed his turn on his way to breakfast. When the testimony shows that an employee is on a personal errand, such as going to or from a meal, at a minimum, a fact issue is raised regarding whether he is within the course and scope of his employment. *See Robertson Tank Lines*, 468 S.W.2d at 360; *Sw. Dairy Prods. Co. v. De Frates*, 125 S.W.2d 282 (Tex. 1939); *Salaiz*, 866 S.W.2d at 637–68.

[24]Williams argues that Rushing's vicarious liability was undisputed and asserts that "appellants were willing to stipulate to Rushing's vicarious liability. "

30

court if it is ambiguous or unclear. *Id.* In construing a stipulation, the intent of the parties is determined from the language used in the entire agreement and by examining the surrounding circumstances, including the pleadings and the attitude of the parties with respect to the issue. *Id.* (citing *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 822 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)). The only evidence of a stipulation in this case came during the charge conference. In objecting to the inclusion of Rushing and Medallion Transport in Question 1, to the instructions accompanying Question 1, and to Question 2, Appellants stated that they had "stipulated that . . . Defendant[s] [Medallion Transport] and [Rushing] are vicariously liable for the actions of [Smith] on the date in question . . ." Then the following exchange took place:

> [Plaintiff's Counsel]: For the record, we do not accept their stipulation of liability.

> THE COURT: I understand. And make sure that --

> [Defense Counsel]: Well, I didn't stipulate liability.

> [Plaintiff's Counsel]: Stipulated to vicarious liability.

> THE COURT: All right. And that's overruled.

Thus, it appears that, although Rushing and Medallion Transport offered to stipulate to being vicariously liable for the actions of Smith, their offer was rejected by Williams. In this circumstance, the trial court was required to disregard the attempted stipulation, and it could not be relied on as a basis for an implied finding of vicarious liability on the part of Rushing. *See id.* at 176.

Since the evidence does not conclusively establish that Smith was acting as Rushing's employee at the time of the accident, and there was no effective stipulation that Rushing was

31

vicariously liable for Smith's actions, this ground of recovery was waived. *See Salaiz*, 866 S.W.2d at 635; TEX. R. CIV. P. 279. Therefore, we sustain this point of error and find that the judgment against Rushing was entered in error. "In a multiple defendant case, when one defendant is not found negligent by the jury, and an appeals court leaves that finding intact, remand is improper for the defendant whose liability in negligence has been determined." *Methodist Hosps. of Dallas v. Sullivan*, 714 S.W.2d 302, 303 (1986) (per curiam) (citing *Acord v. Gen. Motors, Inc.*, 669 S.W.2d 111, 116–17 (Tex. 1984)). In this case, the jury finding that Rushing was not responsible for the occurrence or injury has not been challenged, and remand as to Rushing would be improper. We, therefore, reverse the trial court's judgment against Rushing and render a take-nothing judgment in his favor.

*(3)    Legally Sufficient Evidence Supported the Jury Findings on Williams' Future Damages*

Appellants also complain that the trial court erred in awarding $350,000.00 for future medical expenses, $1,471,011.00 in future lost earnings, and $500,000.00 for future physical impairment, asserting there is no evidence to support these damages. They argue that these damages are supported only by expert testimony that should have been excluded since it was incompetent to show the *existence* and the *amount* of damages.[25] Appellants maintain that Williams' expert physician, Dr. Aaron Calodney, was not qualified to testify regarding Williams' need for future surgery, her future impairments after surgery, or her likely ability to work as a

---

[25]Since we are remanding the case for a new trial, we need not address the *amounts* of the damages, but we do examine whether there is legally sufficient evidence to support the *existence* of these damages. We address the no-evidence point as to the existence of damages since, if we sustain it, we are to disregard the findings and render judgment for Appellants on these damages, unless a new trial is required in the interests of justice. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

32

nurse after surgery. Further, they argue that the opinion of James Davis, CPA, as to lost future earnings is unreliable because (1) it is founded on Dr. Calodney's unreliable testimony and (2) it is based on an extrapolation from only one year of Williams' earnings history (the only year in which Williams worked full time). Williams responds that the evidence shows that Calodney was qualified to testify regarding her need for future surgery, her future medical expenses, her future impairments after surgery, and her likely ability to work as a nurse after surgery. In addition, she argues that, even disregarding the complained-of testimony from Calodney, there is sufficient evidence to support both Davis' testimony and the jury's findings on these items of damages. We agree.

In reviewing evidence for legal sufficiency, we "view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Endsley Elec., Inc. v. Altech, Inc*., 378 S.W.3d 15, 21 (Tex. App.—Texarkana 2012, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). If a reasonable and fair-minded jury, when considering the evidence at trial, could disagree in their conclusions, then we may not substitute our judgment for theirs. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). The evidence is legally sufficient "if there is more than a scintilla of evidence to support the finding." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Holt Atherton Indus. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *accord Pilgrim's Pride Corp. v. Cernat*, 205 S.W.3d 110, 119 (Tex. App.— Texarkana 2006, pet. denied).

"The qualification of a witness as an expert is within the trial court's discretion." *Broders v. Heise*, 924 S.W.2d 148, 151 (1996). Absent clear abuse, the trial court's decision is not disturbed. *Id.* The "party offering the expert's testimony bears the burden to prove that the witness is qualified under Texas Rule of Civil Evidence 702."[26] *Id.* While a challenge to the admissibility of expert testimony is reviewed for abuse of discretion, a party on appeal may assert that its unreliability makes it not only inadmissible, but also legally insufficient to support a verdict. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009).

"Admissibility of the expert's opinion hinges on whether the expert has special knowledge concerning the matter on which his opinion is sought that will assist the trier of fact." *Travelers Ins. Co. v. Wilson*, 28 S.W.3d 42, 48 (Tex. App.—Texarkana 2000, no pet.) (citing TEX. R. EVID. 702). Not every medical doctor will qualify as an expert in a given case; rather, the offering party must show that the medical expert has the required "'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject.'"[27] *Id.* (quoting *Broders*, 924 S.W.2d at 153). Regarding his

---

[26]"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702.

[27]In challenging Dr. Calodney's qualifications to testify regarding the need for surgery, Appellants rely heavily on cases involving health care liability claims. *See Cortez v. Tomas*, No. 02-11-00231-CV, 2012 WL 407382 (Tex. App.—Fort Worth Feb. 9, 2012, no pet.) (mem. op.); *Ibrahim v. Gilbride*, No. 14-09-00938-CV, 2010 WL 5064430 (Tex. App.—Houston [14th Dist.] Dec. 9, 2010, no pet.) (mem. op.). However, these claims involve expert testimony "on the issue of the causal relationship between the alleged breach and the injury claimed." *Cortez*, 2012 WL 407382, at *3. In order to be qualified to submit the report required by statute in health care liability claims, the expert must not only be qualified to render an opinion under Rule 702 of the Texas Rules of Evidence, he must also meet other specific statutory requirements. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(A) (West Supp. 2014), §§ 74.401(a), (c), 74.403(a) (West 2011); TEX. R. EVID. 702. Under Section 74.401, the expert must be a physician who:

qualifications to opine as to the necessity of surgery, the anticipated outcomes, and Williams' likelihood of working after surgery, Calodney testified that he specializes in treating disorders and injuries to the spine, that he is one of the founders of the Texas Spine & Joint Hospital, and that he has neurosurgical partners. He is an anesthesiologist and has done a fellowship in interventional pain management. He has done research and lectured on the spine. He has been referring patients with Williams' condition for spine surgery for twenty years and has followed hundreds or thousands of patients before, during, and after surgery for over twenty years. During these years, he has seen conditions like Williams', and he knows when patients need certain types of surgery. He has been a designated doctor for workers' compensation matters, and he has performed evaluations and assessments of patients to determine impairment and future abilities. For twenty

---

(1)     is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2)     has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)     is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM. CODE ANN.§ 74.401(a). In this case, Dr. Calodney is not testifying as to the standards of medical care and an alleged breach, but rather to the next step in Williams' course of treatment of her injuries. *See also*, the Texas Supreme Court's decision in *Broders*, and this Court's decisions in *Wilson* and *K Mart Corp. v. Rhyne*, 932 S.W.2d 140, 146 (Tex. App.—Texarkana 1996, no writ). Although Appellants rely on these cases, they clearly used the standard under Rule 702, rather than the standard used in health care liability claims. *Broders* concerned the exclusion of the testimony of an emergency room physician regarding the cause in fact of the death of a patient who had suffered brain injuries. The court found no abuse of discretion in excluding his testimony since even though "he knew both that neurosurgeons should be called to treat head injuries and what treatments they could provide, he never testified that he knew, from either experience or study, the effectiveness of those treatments in general, let alone in this case." *Broders*, 924 S.W.2d at 153. Therefore, his opinions on cause in fact would not have risen above speculation. *Id.* In *Wilson*, this Court held that the trial court did not abuse its discretion in excluding an orthopedic surgeon's testimony regarding whether the plaintiff's chiropractic care was reasonable or necessary, since he had no training or expertise in chiropractic care, and there was no showing that his "medical training and experience as an orthopedic surgeon qualified him to opine about the reasonableness and necessity of chiropractic treatment." *Wilson*, 28 S.W.3d at 48. In *Rhyne*, this Court held that the trial court abused its discretion in allowing a chiropractor to testify as to the *cost* of future surgeries since there was no showing that he was qualified to opine as to the cost of the surgeries. *Rhyne*, 932 S.W.2d at 146.

years, he also performed social security disability assessments for his patients with spinal injuries regarding their vocational capabilities, whether they need vocational rehabilitation, and whether they can return to work. Regarding Williams, he testified that he had assessed her throughout her course of treatment. He is familiar with both surgeries that she may undergo and how they are performed. He has treated nurses with Williams' condition and seen what they can and cannot do after the surgery. Further, he testified that he is familiar with the costs of the surgeries because of his involvement with a surgical hospital. After going over all of her medical records, he testified in the presence of the jury that she has an internally disrupted disc in her lumbar spine and that she was initially treated with neurobiological, non-surgical treatments, but that she continues to be symptomatic. He testified that, in his opinion, she would need either a lumbar fusion or disc replacement. He further described the two surgeries and the costs of the surgeries. He also testified that he has been in the operating room while these procedures were being performed. He then opined as to the medical care Williams would need and the costs she would incur in the future based on his "history with people with an internal disc reconstruction at L4-L5." He also testified about the medications and imaging tests Williams would need. Regarding her future likelihood of returning to work, he testified that he has over twenty years' experience determining what jobs people can and cannot do. His testified of the problems she would have because of the injury to her cervical and lumbar spine. Finally, he opined that Williams would not work again as a nurse, but that she may be able to do clerical work.

Although Calodney is not a surgeon, we cannot say the trial court erred in allowing him to testify that Williams will need surgery. The Eastland Court of Appeals found that a chiropractor,

36

even though he was not a surgeon, was qualified to testify that the plaintiff's back injury, which he suffered in an accident, required surgery. *Hayhoe v. Henegar*, 172 S.W.3d 642, 644 (Tex. App.—Eastland 2005, no pet.). In that case, the chiropractor testified that he had been practicing for twenty years, that he served as a professor at the Texas Chiropractic College, and that he was familiar with the anatomy and conditions of the spine. He also testified regarding the tests he performed in diagnosing the plaintiff's herniated disc, that he has treated other patients with herniated discs, and that he often refers these patients to a surgeon. *Id.* Since he had "extensive experience with chiropractic medicine in general and herniated discs in particular," the appellate court held that the trial court had not abused its discretion in finding that he was qualified to testify as to the need for surgery. *Id.* In this case, Calodney testified regarding his experience in treating other patients with this same injury both before and after surgery, his specialization in treating disorders and injuries of the spine, his familiarity with the surgical procedures, and his extensive research and lecturing regarding injuries to the spine and available treatments. In addition, he testified regarding his course of treatment of Williams in particular. Therefore, we find that the trial court did not abuse its discretion in finding him qualified to render an opinion, based on his knowledge, skill, experience, training, or education, as to the need for surgery and the anticipated outcomes of the surgery. *See Broders*, 924 S.W.2d at 151.

In addition to Calodney's testimony regarding Williams' need for surgery, there was additional evidence that would support the jury's finding of future medical costs and future impairment. Although an award of future medical expenses must be based on reasonable probability, it does not require expert testimony. *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex.

37

App.—Fort Worth 2005, pet. denied); *Gen. Shelters of Tex., LTD v. Hicks*, No. 12-03-00081-CV, 2004 WL 1475104, at *3 (Tex. App.—Tyler June 30, 2004, no pet.) (mem. op.) (citing *Blankenship v. Mirick*, 984 S.W.2d 771, 778 (Tex. App.—Waco 1999, pet. denied); *Hughett v. Dwyre*, 624 S.W.2d 401, 405 (Tex. App.—Amarillo 1981, writ ref'd n.r.e.)). Evidence of the nature of the plaintiff's injuries, the medical care rendered in the past, and the condition of the plaintiff at the time of trial will support an award for future medical expenses. *Antonov*, 168 S.W.3d at 908; *Hicks*, 2004 WL 1475104, at *3. Further, "[p]hysical impairment encompasses the loss of the injured party's former lifestyle." *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 253 (Tex. App.—Texarkana 2005, no pet.). Evidence of her activities before the accident compared with her activities after the accident, the nature of her injuries, and her impairment will support an award for future impairment. *See id.* As discussed above, Calodney testified, without objection, regarding Williams' past medical care and current impairment. In addition, there was evidence that Williams had worked full-time as a nurse and of the outdoor activities she enjoyed before the accident. She testified that she could no longer work as a nurse or do those activities and why she did not believe she would be able to work as a nurse again. We find there was more than a scintilla of evidence to support the jury findings of the existence of future medical expenses and future impairment.

Appellants attack the reliability of Davis' testimony regarding future lost wages[28] as (1) being based on Calodney's opinion that Williams would not be able to work in the future and

---

[28]Although the court's charge describes this damage category as "lost wages . . . that in reasonable probability will be sustained in the future," Davis testified that "what she lost is her earning capacity." Appellants do not assert any error in this regard.

38

(2) not being based on a "representative wage" since it was based on only one year's earnings. Although Davis testified that he based his opinion on the assumption that Williams would not be able to work as a nurse again, it is not clear that assumption is based solely on Calodney's testimony. Loss of earning capacity may be shown by a plaintiff's activities before the accident compared with her activities after the accident. *See Cernat*, 205 S.W.3d at 119; *see also Tagle v. Galvan*, 155 S.W.3d 510, 519 (Tex. App.—San Antonio 2004, no pet.) (evidence of loss of future earning capacity includes "evidence of past earnings; the plaintiff's stamina, efficiency, and ability to work with pain; the weaknesses and degenerative changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy"). Calodney's testimony would support Davis' assumption that Williams would not work again as a nurse. Therefore, we find that the trial court did not abuse its discretion in admitting Davis' testimony that Williams would suffer a loss in her future earning capacity.

In addition, there was other evidence that would support the jury finding of the existence of future loss of earning capacity. Evidence that the plaintiff's physical limitations prevent her from performing the occupation she had performed before the accident, and will do so in the future, along with some evidence of what she earned in the past, will support an award of loss of earning capacity. *See Cernat*, 205 S.W.3d at 120. There was evidence of Williams' earnings working as a nurse before the accident. In addition, Calodney's unchallenged testimony regarding her current impairment, the evidence that Williams had worked full-time as a nurse before the accident, and her testimony that she can no longer work as a nurse and why she believed she would be unable to work as a nurse again all support this finding. Therefore, we find there was more than a scintilla

of evidence to support the jury's finding of loss of earning capacity. Since there was more than a scintilla of evidence to support the existence of each of the categories of future damages, we overrule this point of error.

*(4)    Our Holdings Moot Other Issues Before Us*

Approximately five weeks before trial, Appellants' counsel had his staff search Facebook to determine if Williams had a Facebook account. After locating Williams' Facebook page, they discovered that there were several photographs of Williams showing her hunting deer and wild pigs that were posted in November 2011, seven months after the accident. Appellants produced copies of these photographs to Williams a few days before trial, and Williams promptly filed a second amended motion in limine asking the trial court to exclude the photographs since they were untimely produced. In a pretrial hearing, Williams argued that she had made a request for production of any photographs of her before or after the accident and that, although Appellants had possession of the photographs as of November 8, 2013, they did not produce them to her until December 12, four days before trial. Therefore, she argued under Rule 193.6 of the Texas Rules of Civil Procedure, they should be excluded. *See* TEX. R. CIV. P. 193.6. Appellants argued that they had intended to impeach Williams using her actual Facebook page, but that they were prevented from doing so when she abruptly deactivated her Facebook page the week before trial. They then produced the photographs out of an abundance of caution. They also questioned whether they had an obligation to produce them at all since the photographs were under Williams'

40

custody and control and since she had posted them in the public domain on Facebook.[29]  In

addition, they argued that, since she had posted them on her Facebook page, she could not be

unfairly surprised.  The trial court excluded the photographs before trial, since it did not find "any

good cause for the introduction of the evidence," but found unfair surprise and unfair prejudice.[30]

Appellants complain that the trial court abused its discretion when it excluded photographs

obtained from Williams' Facebook page.  Our understanding is that the trial court granted

Williams' motion to exclude these photographs since they were untimely produced to her several

days before trial with no good cause for the late production and that their admission into evidence

would cause unfair surprise or unfair prejudice to Williams.  When a case has been remanded for

new trial, it "stands upon the docket as if it had not been tried." *Winfield v. Daggett*, 846 S.W.2d

920, 922 (Tex. App.—Houston [1st Dist.] 1993, no writ); *State Dep't. of Highways & Public

Transp. v. Ross*, 718 S.W.2d 5, 11 (Tex. App.—Tyler 1986, no writ).  Any pretrial orders related

to the first trial "would also be obliterated." *Ross*, 718 S.W.2d at 11.  Since the photographs have

already been produced, the passage of time would also resolve any issues regarding the timeliness

of the production, unfair surprise, or unfair prejudice.  Therefore, our remand of this case for a

new trial renders this point of error moot.

Medallion Transport also complains that the trial court abused its discretion by instructing

the jury that Medallion Transport could be held liable for negligence if it found that Medallion

---

[29]At trial, in an offer of proof made before cross-examination, Williams admitted taking the photographs and posting them on her Facebook page, but claimed they had been taken in 2009 and 2010.

[30]Rule 193.6 generally excludes evidence that was not timely disclosed, unless the trial court finds that there was either good cause for the failure to timely disclose the evidence or that the failure to timely disclose "will not unfairly surprise or unfairly prejudice the other part[y]."  TEX. R. CIV. P. 193.6 (a)(1), (2).

41

Transport hired and retained an incompetent driver or failed to train an employee as a corporation of ordinary prudence would have done. Medallion Transport asserts that there was no evidence to support the instructions and that the instructions were improper comments on the weight of the evidence.[31] The trial court may submit an instruction "'if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence.'" *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855–56 (Tex. 2009)). Since this case is being remanded for new trial, we cannot predict whether the trial court will submit these same instructions, or if the evidence at the new trial will support the same. Therefore, our remand of this case for a new trial renders this point of error moot.

---

[31]The trial court included the following instructions in Question No. 1:

> As to Medallion Transport Logistics, LLC[,] and Tomy Rushing d/b/a Rushing Transport Services, Inc., "negligence" also means hiring or retaining or supervising in its employ an incompetent employee whom it knew, or by the exercise of reasonable care, should have known was incompetent, and thereby creating an unreasonable risk of harm to others.

> As to Medallion Transport Logistics, LLC[,] and Tomy Rushing d/b/a Rushing Transport Services, Inc., "negligence" also means failing to train its employees as a corporation of ordinary prudence would have done under the same or similar circumstances.

Appellants objected that the instructions were a comment on the weight of the evidence and that the probative value in helping the jury was outweighed by the prejudicial impact of the instructions.

We reverse the trial court's judgment against Rushing and render a take-nothing judgment in his favor. We also reverse the trial court's judgment against Smith and Medallion Transport and remand the case to the trial court for a new trial between Smith, Medallion Transport, and Williams consistent with this opinion.

        Josh R. Morriss, III
        Chief Justice

Date Submitted:    April 1, 2015
Date Decided:    May 29, 2015