

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-17-00121-CV

---

ISABEL CORTES AND JOHNNY FERNANDES, Appellants

V.

SHARON WENDL AS ATTORNEY IN FACT AND A/N/F FOR ADA EDNA HARDY,
Appellee

---

On Appeal from the 4th District Court
Rusk County, Texas
Trial Court No. 2016-348

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

At the age of eighty-five, the widowed and ailing Ada Edna Hardy was a resident of Brookdale Assisted Living in Henderson, six years after selling[1] her home place with fifteen acres and retaining the mineral rights[2] in the property. As a result of what Hardy would later describe as a campaign of duress, coercion, and undue influence on Hardy by Isabel Cortes and Cortes' ex-husband, Johnny Fernandes, Hardy reportedly "gave up" and, without consideration and without "her own free will or volition," accompanied Cortes to a local title company and signed a deed transferring to Cortes seventy-five percent of her mineral rights and all of her previously accrued mineral and royalty interests.[3]

When Hardy's nurse and friend, Sharon Wendl, learned from Hardy that she thought she had "been swindled," Wendl investigated the matter, obtained a power of attorney from Hardy, and ultimately filed a lawsuit on Hardy's behalf against Cortes and Fernandes. In her lawsuit, Wendl claimed that the mineral deed was executed as a result of Cortes' and Fernandes' exertion

---

[1]Hardy sold the house and land to Joseph M. Coutts on September 16, 2010. Later, Coutts had deeded the property to Isabel Cortes and The Elton John Fernandes and Elvis John Fernandes Trust.

[2]The deed had reserved to Hardy

> all interests in the oil, gas and associated hydrocarbons produced in association with oil or gas, that may be produced from the above property, together with the right of ingress and egress at all times for the purpose of mining, drilling, exploring, operating and developing said lands for oil, gas and other minerals and removing the same therefrom.

[3]The deed to Cortes not only transferred three-quarters of the minerals, but also added the following language:

> In addition to the foregoing and for the same consideration hereof, Grantor does hereby Transfer, Assign, and Set Over unto Grantee all of Grantor's interest in and to all claims, demands, monies, proceeds, income, rights of recovery, cause of action, settlements, production held and other personal properties now on hand or in the possession of any third party, bank, trustee, or pipeline company, which have heretofore accrued to the mineral and/or royalty interest of Grantor in said land that has been conveyed to Grantee.

of duress, coercion, and undue influence on Hardy; that no consideration was paid for the conveyance; and that it was not executed by Hardy "of her own free will or volition." Wendl further claimed that Cortes took a check made payable to Hardy in the amount of $67,876.89, representing royalties paid and owed to her by Sabine Oil & Gas Corporation relative to these mineral rights. Following a bench trial, the trial court declared the mineral deed void and entered judgment for, among other things, actual damages in the amount of $52,881.89 and for punitive damages in the amount of $50,000.00 against Cortes and $50,000.00 against Fernandes.

On appeal, Cortes and Fernandes claim that the trial court erred in permitting Wendl to prosecute the lawsuit on Hardy's behalf as her next friend, in denying Cortes' motion for leave to designate a responsible third party, and in declaring the mineral deed void and cancelling the deed. We affirm the trial court's judgment, because we find that (1) Wendl was authorized to prosecute the lawsuit pursuant to a durable power of attorney, (2) there was no error in denying leave to designate a responsible third party, and (3) the evidence is legally and factually sufficient to support the trial court's cancellation of the mineral deed.

*(1)*      *Wendl Was Authorized to Prosecute the Lawsuit Pursuant to a Durable Power of Attorney*

In her original petition, Wendl sued Cortes as "Sharon Wendl as Attorney In Fact for Ada Edna Hardy" and alleged that she was acting by and through her authority derived from a power of attorney, a copy of which was attached to the petition. In her second and third amended petitions, Wendl continued to allege that she was acting on authority of the power of attorney, but further alleged that she was acting on behalf of, and as next friend for, Hardy. Cortes and

3

Fernandes challenge Wendl's authority to prosecute the lawsuit on Hardy's behalf. A review of the background facts is necessary in the examination of the issues presented.

Hardy reserved the mineral estate when she sold her home place because her father told her never to sell minerals, and her deceased husband would not have wanted her to sell the minerals.[4] Nevertheless, Cortes and Fernandes,[5] who lived together on Hardy's former home place, continually urged Hardy to deed Cortes the mineral rights. According to Hardy, when Cortes and Fernandes delivered the monthly note payment to Hardy at Brookdale, they told her that the land was no good to them without the minerals. This happened each time they delivered the note payment, and it bothered Hardy since she did not wish to sell the minerals. When Hardy persisted in refusing to sell, Fernandes told her, "The IRS is going to be after you." Hardy testified that she was frightened by this prospect.

Hardy testified that she had seizures after her husband passed away and that she felt like she was going to start having seizures again due to the pressure to sell her minerals. According to Hardy, Cortes knew that she did not want to sell the minerals, and she would not have done so if Cortes and Fernandes had not threatened her with the IRS and frightened her. Sometimes Fernandes would come into Hardy's room at Brookdale, and the two of them were there alone. The same thing happened with Cortes. Hardy did not feel safe in her room and locked her door

---

[4]Coutts executed a promissory note to Hardy for $65,000.00, secured by a deed of trust. Although the property was sold to Coutts, Cortes paid the earnest money deposit on the sale and made payments to Hardy at Brookdale every month. While this detail is not entirely clear from the record, it appears that Cortes made payments on the promissory note from its inception. Coutts formally deeded the property to Cortes in February 2011.

[5]Neither Cortes nor Fernandes testified at trial, although Cortes testified at a temporary injunction hearing on November 30, 2017.

during the day because she was afraid Fernandes or Cortes might hurt her. Hardy felt like a "nervous wreck," felt she had no choice but to sell the minerals, and "just couldn't take it any longer." The situation was making her nervous, and she was shaking. Despite the fact that Hardy needed the mineral income to pay her bills at Brookdale, she testified that she "just [gave] up."

Although the date of its delivery is not in the record, a check dated January 29, 2016, in the amount of $67,876.89 made out to Edna Hardy from Sabine Oil & Gas Corporation was delivered to Hardy's former home, where Cortes and Fernandes resided. During this same time period, on February 5, 2016, Hardy deeded her mineral rights to Cortes because Hardy claimed to have been frightened and worried. Cortes drove Hardy to the U.S. Title Company in Longview to execute the deed. Hardy testified that she did not read the mineral deed and that no one read it to her. She did not have a friend or someone she trusted look over the document before she signed it. According to Hardy, Cortes did not pay for the minerals. Cortes disputes this and testified that the minerals were deeded to her in exchange for topsoil that had previously been removed from the property.[6]

After execution of the mineral deed, Cortes drove Hardy to the Woodforest Bank located within the Walmart in Henderson on February 27, 2016, where she opened a joint checking account with Hardy with an initial deposit of twenty-five dollars provided by Cortes. Both Cortes and Hardy received a debit card for the account. According to Hardy, Cortes told her, "[S]ign this check," which resulted in her endorsement of the Sabine Oil & Gas Corporation royalty check.

---

[6]Prior to the sale, Hardy executed a contract with Reedy Trucking, Inc., for the removal of top soil from the property. In conjunction with the sale of the home place, Reedy modified the agreement to exclude removal of top soil from the area around the house.

On February 29, the royalty check was deposited into the joint account at the bank's Longview branch. On March 10, Fernandes withdrew $500.00 from the account at an automatic teller machine in Henderson. Also on March 10, a cashier's check was issued from the account to Cortes at the Longview branch in the amount of $36,508.69. On that same date, a second cashier's check was issued to Cortes at the Longview branch in the amount of $13,000.00. The second cashier's check was held until March 24, when Cortes cashed it at the Henderson branch. Ten thousand dollars was disbursed to Cortes in cash, and a new cashier's check in the amount of $3,000.00 was issued to Randy Hardy, Hardy's son. A final cashier's check in the amount of $2,500.00 was issued to Randy Hardy on March 10, a transaction authorized by Cortes. On March 11, there were two debit transactions—one to Walmart in the amount of $148.84 and one to Fadal Pediatrics in the amount of $194.00. On March 12, there was a single debit transaction in the amount of $56.36 to IHOP in Longview. The remaining balance in the account on March 12 was $14,995.00.

This course of events was uncovered by Wendl, a home health nurse who has cared for Hardy at Brookdale since 2014. The two eventually became friends. On March 24, while visiting Hardy, Wendl noticed that Hardy seemed very upset and was trembling. When Wendl asked Hardy what was wrong, Hardy replied, "I think I've been swindled." Hardy told Wendl that she signed a form at the bank and was bothered when Cortes was given a debit card. When asked why she would open an account with Cortes, Hardy could not provide an explanation, but expressed the opinion that "something had happened" when she saw that "the bank lady" handed Cortes a card. Wendl was already aware that Cortes and Fernandes had been pressuring Hardy to sign over her mineral rights. Hardy told Wendl that she signed a document having to do with her minerals,

6

because Cortes and Fernandes told her that the IRS was after her, and she needed to sign over her mineral rights so she would not be in trouble. Hardy began to experience tremors, and that worried Wendl. She began to believe that something was wrong, and at Hardy's request, Wendl took the debit card to the bank to check Hardy's account balance. Because she did not have the correct pin number, Wendl was unable to check the balance.

Wendl then spoke with a teller at the Woodforest Bank in the Henderson Walmart, where she learned that a large amount of money had been deposited into the account and that only a small amount remained. After that, Wendl was able to get Hardy on a speaker phone with the teller, who gave the teller permission to discuss the account with Wendl. That is when Wendl discovered the $67,000.00 deposit and the significant withdrawals. Hardy was unaware of the fact that she had had a $67,000.00 royalty check, and she told Wendl that she did not give Cortes permission to take any of those funds.

After Wendl reported the matter to the Henderson Police Department,[7] Hardy executed the durable power of attorney in favor of Wendl, appointing Wendl as her agent in a number of areas,[8] and specifically giving Wendl the authority to sue on her behalf.

---

[7]Cortes was indicted for theft on June 5, 2017.

[8]Hardy executed a statutory durable power of attorney wherein she appointed Wendl to act for her with respect to the following powers: real property transactions, tangible personal property transactions, stock and bond transactions, commodity and option transactions, banking and other financial institution transactions, business operating transactions, insurance and annuity transactions, estate, trust, and other beneficiary transactions, claims and litigation, personal and family maintenance, benefits from social security, Medicare, Medicaid, or other governmental programs or civil or military service, retirement plan transactions, and tax matters. The power of attorney states that it is not affected by Hardy's subsequent disability or incapacity.

Cortes and Fernandes complain that, because the record has no specific allegations confirming that Hardy is or was under any legal disability, Wendl had no authority to initiate litigation as next friend of Hardy. *See* Tex. R. Civ. P. 44.[9] They further claim that the statutory durable power of attorney Hardy granted to Wendl was invalid because that power was granted at a time when a previous power of attorney Hardy had granted to Randy Hardy had not been revoked and was still active and valid.

Wendl contends that Cortes and Fernandes failed to preserve any complaint regarding Wendl's capacity to bring suit on Hardy's behalf. A party's capacity implicates its legal authority to file a lawsuit and pursue a particular cause of action. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 847–48 (Tex. 2005). "[A] party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996).

Cortes filed a verified denial pursuant to Rule 93 of the Texas Rules of Civil Procedure, claiming that Wendl did not have the legal capacity to sue in this action.[10] *See* Tex. R. Civ. P. 93

---

[9]Rule 44 provides,

> Minors, lunatics, idiots, or persons non compos mentis who have no legal guardian may sue and be represented by "next friend" under the following rules:
>
> (1) Such next friend shall have the same rights concerning such suits as guardians have, but shall give security for costs, or affidavits in lieu thereof, when required.
>
> (2) Such next friend or his attorney of record may with the approval of the court compromise suits and agree to judgments, and such judgments, agreements and compromises, when approved by the court, shall be forever binding and conclusive upon the party plaintiff in such suit.

Tex. R. Civ. P. 44.

[10]Although Cortes also challenged Wendl's entitlement to recover in the capacity in which she sued, she has failed to bring a point of error on this challenge. *See* Tex. R. Civ. P. 93(2). Further, to the extent Cortes complains that Wendl

8

(pleading claiming plaintiff lacks legal capacity to sue "shall be verified by affidavit"). That pleading sufficiently preserved error with respect to Cortes' complaint regarding Wendl's capacity to sue.[11] *See Anderson v. New Prop. Owners' Ass'n of Newport, Inc.*, 122 S.W.3d 378, 383 (Tex. App.—Texarkana 2003, pet. denied).[12] And, because the issue of Wendl's capacity to sue was controverted, Wendl had the burden to prove she had the legal capacity to sue. *See Bossier Chrysler Dodge II, Inc. v. Rauschenberg*, 201 S.W.3d 787, 798 (Tex. App.—Waco 2006, pet. granted), *rev'd in part on other grounds*, 238 S.W.3d 376 (Tex. 2007) (per curiam). We need not, however, address the issue of whether Wendl's authority derived from her alleged status as "next friend" of Hardy, because the durable power of attorney in favor of Wendl authorized Wendl to act on her behalf.

We initially observe that the trial court did not file findings of fact and conclusions of law. Consequently, we presume that the trial court made all findings necessary to support its judgment. *See Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 21 (Tex. App.—Texarkana 2012, no pet.)

---

was not authorized to act as Hardy's next friend based on alleged procedural irregularities, she failed to preserve any such complaint for our review on appeal. *See* TEX. R. APP. P. 33.1; *see Saldarriaga v. Saldarriaga*, 121 S.W.3d 493, 494 (Tex. App.—Austin 2003, no pet.) (consent and capacity were at issue when the trial court appointed a next friend to represent a wife in a divorce proceeding without a formal adjudication of her incompetence).

[11]Fernandes waived any objection to Wendl's capacity to sue by failing to file a verified pleading. "[P]arties who do not follow rule 93's mandate waive any right to complain about the matter on appeal." *Nootsie, Ltd.*, 925 S.W.2d at 662; *see* TEX. R. CIV. P. 93(1).

[12]To the extent that Cortes and Fernandes question the validity of the durable power of attorney, we find that this issue has been inadequately briefed, and, therefore, it has been forfeited. Cortes and Fernandes claim that, because Hardy had given her son, Randy, a power of attorney which was never revoked, the power of attorney in favor of Wendl was invalid. No caselaw is cited in support of this proposition, and this issue was not analyzed. Rule 38.1 of the Texas Rules of Appellate Procedure requires that a brief contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An inadequately briefed issue may be waived on appeal. *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (discussing "long-standing rule" that point may be waived due to inadequate briefing); *In re A.S.*, 241 S.W.3d 661, 663 (Tex. App.—Texarkana 2007, no pet.).

9

(citing *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003)); *In re Liu*, 290 S.W.3d 515, 519 (Tex. App.—Texarkana 2009, orig. proceeding).[13] "In such situations, the trial court's ruling must not be disturbed if 'it can be upheld on any legal theory that finds support in the evidence.'" *Liu*, 290 S.W.3d at 519 (quoting *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)). To determine whether some evidence supports the trial court's implied findings, we "consider only that evidence most favorable to the issue and . . . disregard entirely that which is opposed to it or contradictory in its nature." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam) (quoting *Renfro Drug Co. v. Lewis*, 235 S.W.2d 609, 613 (Tex. 1950)); *Lack's Stores, Inc. v. Gregg Cty. Appraisal Dist.*, No. 06-10-00125-CV, 2011 WL 3963013, at *5 (Tex. App.—Texarkana Sept. 9, 2011, no pet.) (mem. op.).

"A power of attorney is a written instrument by which one person, the principal, appoints another person, the attorney-in-fact, as agent and confers on the attorney-in-fact the authority to perform certain specified acts on behalf of the principal." *Comerica Bank-Tex. v. Tex. Commerce Bank Nat'l Ass'n*, 2 S.W.3d 723, 725 (Tex. App.—Texarkana 1999, pet. denied); *see Plummer v. Estate of Plummer*, 51 S.W.3d 840, 842 (Tex. App.—Texarkana 2001, pet. denied). An agent has express authority to take all actions designated by the principal. *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App.—Houston [1st Dist.] 2011,

---

[13]When the appellate record includes the reporter's and clerk's records, however, implied findings are not conclusive and are subject to challenge for legal and factual sufficiency. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Here, Cortes challenged the legal and factual sufficiency of the evidence to support the appointment of Wendl as next friend of Hardy, claiming there is no evidence, or insufficient evidence, to show that Hardy was under a legal disability and thus unable to sue in her individual capacity. She does not, however, challenge the legal or factual sufficiency of the evidence to support Wendl's authority to act as Hardy's attorney-in-fact by virtue of the power of attorney executed in Wendl's favor.

no pet.).  An agent has implied authority "to do whatever is necessary and proper to carry out the agent's express powers."  *Id*.  Wendl introduced the durable power of attorney executed by Hardy as an exhibit, without objection.  The power of attorney explicitly granted Wendl

> [a]uthority to initiate a claim and litigation, if necessary; negotiate; make decisions; and pursue the legal claim [Hardy] may have against Johnny Coutts, Charles [Randy] Hardy, and/or Isabel Cortes, or anyone else involved, and to pursue those claims or litigation as she sees fit for [Hardy] and/or [Hardy's] estate.  [Wendl] is further given specific authority to negotiate and make all decisions on [Hardy's] behalf including accepting or rejecting offers of settlement, contracting for and payment of attorney's fees, and costs.

The record supports the trial court's implied finding that Wendl, in her capacity as agent and attorney-in-fact for Hardy, had the capacity to bring the lawsuit on Hardy's behalf.[14]  We overrule this point of error.

*(2)*     *There Was no Error in Denying Leave to Designate a Responsible Third Party*

Wendl filed her original petition November 21, 2016.  On February 23, 2017, the parties entered into an agreed scheduling order.  The scheduling order set May 1, 2017, as the deadline by which all parties were to be added and served and set the case for jury trial July 24, 2017.  On June 16, 2017, Cortes filed a motion for continuance.  Following a hearing on the motion for continuance, the trial court continued the case and re-set it for trial August 28, 2017.  The trial court also extended the discovery deadline until August 11, 2017.  On July 28, 2017, Cortes filed her motion for leave to designate responsible third party, seeking to designate Hardy's son— Charles Randall Hardy—as a responsible third party.  Hardy objected to Cortes' motion, claiming

---

[14]An agent may sue in his or her own name pursuant to a power of attorney where, as here, the agent pleads that she is acting on behalf of the principal.  *See Rodarte v. Investeco Grp., L.L.C.*, 299 S.W.3d 400, 406 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

11

that the request was untimely. The trial court denied Cortes' motion for leave to designate Randy as a responsible third party. Cortes and Fernandes claim that the trial court abused its discretion in so doing.

Chapter 33 of the Texas Civil Practice and Remedies Code allows a tort defendant "to designate a person as a responsible third party by filing a motion for leave to designate . . . a responsible third party . . . who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought . . . ." TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.004(a), 33.011(6) (West 2015). The motion, however, "must be filed on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date." TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(a).

Cortes filed her motion to designate Randy on July 28, 2017, less than sixty days before the August 28, 2017, trial setting.[15] In the absence of a finding of good cause, the motion was untimely. TEX. CIV. PRAC. & REM. CODE ANN. § 33.004(a). Cortes contends that good cause for the late designation existed because the trial court signed the order setting the case for final trial less than sixty days before the trial date. She contends that the trial court should have extended, but failed to extend, the deadline for the designation of responsible third parties when it continued the trial date, as the deadline for such designation had already passed. Cortes characterizes this action as an "unreasonable shorten[ing of] the deadline over [her] objection," claiming that she could not have complied with the statutory deadline. Cortes relies on *In re United Parcel Service*,

---

[15]Fernandes did not file a motion to designate a responsible third party in the trial court and thus failed to preserve this issue for our review. *See* TEX. R. APP. P. 33.1.

12

*Inc.*, No. 09-18-00002-CV, 2018 WL 753503, at *1 (Tex. App.—Beaumont Feb. 2, 2018, orig. proceeding) (per curiam) (mem. op.).

In that case, the trial court entered a scheduling order requiring responsible third parties to be designated by June 2017. In October 2017, more than sixty days before the December 2017 trial setting, UPS filed a motion to designate responsible third parties. Also in October 2017, the trial court issued a new docket control order, vacating the December trial setting and extending several discovery deadlines. The order did not set a new trial date, but retained the June 2017 deadline for designating responsible third parties. *Id.* at *1–2. In December 2017, the trial court issued another docket control order, setting the case for trial in April 2018. It retained the June 2017 deadline for designation of responsible third parties. *Id.* at *2. The trial court denied UPS's motion for leave to designate responsible third parties.

In its petition for writ of mandamus, UPS argued that the trial court unreasonably shortened the deadline to designate responsible third parties through its docket control order. Our sister court determined that the sixty-day deadline set forth in Section 33.004(a) of the Civil Practice and Remedies Code "established the guiding rule and principle that the trial court should have followed in deciding whether UPS's motion to designate responsible third parties was timely," because this section "imposes a mandatory duty requiring a court to grant a motion for leave to designate responsible third parties if the request is filed at least sixty days before the trial date." *Id.* at *4–5. It concluded that the trial court's refusal to grant UPS's motion "when the court freely amended other deadlines was arbitrary, and constituted a clear abuse of discretion given the statutory deadline in section 33.004 . . . ." *Id.* at *5.

13

Here, unlike the situation in *United Parcel Service*, Cortes' motion to designate was untimely because it failed to comply with Section 33.004(a) of the Civil Practice and Remedies Code, not because it failed to comply with the scheduling order deadline. Also, Cortes never filed a motion to designate that was compliant with the statutory sixty-day deadline. This is true despite the fact that the trial was originally scheduled for July 24, 2017. At no time before that trial date did Cortes ever file a motion to designate Randy as a responsible third party.

It is apparent from the record of the temporary injunction hearing on November 30, 2017, that Cortes was on notice that Randy may have been, at least in part, responsible for the course of events resulting in the transfer of minerals. At that hearing, Wendl testified that Hardy related to her that "Johnny [Fernandes,] Isabel [Cortes,] and Randy" told her that the IRS was after her when explaining what happened with the minerals. She further testified that "they" told her that she needed to sign over her mineral rights so that she would not be in trouble. Wendl further testified that Cortes' March 10 bank withdrawal request in the amount of $2,500.00 in Randy's name was one of the reasons that caused her to become suspicious. According to Wendl, Hardy did not trust Fernandes, Cortes, or Randy. She related that Randy visited Hardy at Brookdale and told her that he was going to take her out to dinner. Instead, Fernandes drove Hardy to his store, and Randy disappeared. That caused Hardy to feel pressured, and she signed over her mineral rights.

During that same hearing, James Dukes, a detective for the Henderson Police Department, testified that he was able to contact Randy. Randy told Dukes that the $2,500.00 he received from Cortes was "for helping negotiate the sale of the mineral rights." At the November hearing, Cortes

14

also revealed knowledge of Randy's involvement. She testified that she gave Randy $2,500.00 in cash at the Walmart parking lot and that she also gave Randy $10,000.00 in cash.

Despite this knowledge, there was no motion to designate Randy as a responsible third party until July 28, 2017. In that motion, Cortes argued that Randy was liable to her for all or part of the damages claimed because "CHARLES RANDAL [sic] HARDY was present during all the transactions. He took money from the check and he is well aware of the facts of this case. Therefore, CHARLES RANDALL HARDY is or may be liable to the Plaintiff for all or part of her alleged damages, as CHARLES RANDALL HARDY was a proximate cause or the sole proximate cause of the occurrence in question and the Plaintiffs damages, if any." As previously pointed out, Cortes was aware of Randy's alleged involvement as of at least November 30, 2017.[16]

On this record, the trial court did not abuse its discretion in failing to find good cause to permit Cortes to designate Randy as a responsible third party within sixty days from the date of trial. *See, e.g.*, *In re Unitec Elevator Servs. Co.*, 178 S.W.3d 53, 59 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding) (trial court did not err in rejecting assertion of good cause for untimely motion where motion filed more than eighteen months after identity of potentially responsible third party was known).

---

[16]Cortes' June 16, 2018, motion for continuance of the original trial date asked that the case be re-set on the next available court date. At the hearing on her motion for continuance, Cortes cited the fact that she was under criminal prosecution for the matters involved in the civil case and that she did not have adequate time to complete discovery. She never indicated the need for additional time to designate a responsible third party. Hardy's counsel pointed out that Hardy's health was not the best, and it was declining. Counsel related his concern that the case be set for trial at a time when Hardy was able to testify and did not want it put off indefinitely.

*(3)     The Evidence is Legally and Factually Sufficient to Support the Trial Court's Cancellation of the Mineral Deed*

In its final judgment, the trial court declared the mineral deed void:

> The Mineral/Royalty Conveyance between Ada Edna Hardy, a/k/a Edna A. Hardy, and Isabel Cortes, dated February 5, 2016, and recorded at Volume 3428, Page 494, Official Public Records, Rusk County, Texas, is hereby declared void and is rescinded and cancelled as of the date of its execution.

Cortes contends that the evidence is legally and factually insufficient to support the judgment rescinding the deed and declaring it void.[17] The grounds for rescission of the deed set forth in the third amended petition include coercion, duress, undue influence, fraud, and statutory fraud.

As previously stated, findings of fact and conclusions of law were neither requested nor filed.[18] Consequently, "we presume that the trial court made all findings necessary to support its judgment." *Endsley*, 378 S.W.3d at 21. "In such situations, the trial court's ruling must not be disturbed if 'it can be upheld on any legal theory that finds support in the evidence.'" *Liu*, 290 S.W.3d at 519. Further, in reviewing factual and legal sufficiency challenges to the evidence in a

---

[17]Although the final judgment also (1) granted judgment for actual damages against Cortes and Fernandes, jointly and severally, in the amount of $52,881.89, (2) granted prejudgment interest on such actual damages against Cortes and Fernandes, jointly and severally, (3) awarded attorney fees, expenses, and court costs in the amount of $33,629.15, (4) granted judgment for punitive damages of $50,000.00 against Cortes, and (5) granted judgment for punitive damages of $50,000.00 against Fernandes, neither Cortes nor Fernandes challenge these damage awards.

[18]On August 22, 2017, before the trial, Cortes filed a document captioned, "Proposed Findings of Fact and Conclusions of Law" filed "for the bench trial." Rule 296 of the Texas Rules of Civil Procedure provides,

> In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law. Such request shall be entitled "Request for Findings of Fact and Conclusions of Law" and shall be filed within twenty days after judgment is signed with the clerk of the court, who shall immediately call such request to the attention of the judge who tried the case. The party making the request shall serve it on all other parties in accordance with Rule 21a.

TEX. R. CIV. P. 296. Cortes failed to request the entry of findings of fact and conclusions of law. Cortes makes no appellate complaint that the trial court failed to file findings of fact and conclusions of law.

16

non-jury case without findings of fact, but with a reporter's record, as here, we apply the same standard of review to the implied findings as we would apply to a jury's findings. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989) (per curiam); *see Marchand*, 83 S.W.3d at 795. "For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails." *Marchand*, 83 S.W.3d at 795 (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

When considering a factual sufficiency challenge, we must consider and weigh all the evidence, not just the evidence that supports the trial court's judgment. *Lambright v. Trahan*, 322 S.W.3d 424, 430 (Tex. App.—Texarkana 2010, pet. denied). We will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). Under either standard of review, we must be mindful that the trial court as finder of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

A deed procured by fraud, duress, or undue influence, although otherwise regular on its face, is voidable. *Nobles v. Marcus*, 533 S.W.2d 923, 926 (Tex. 1976); *Dyer v. Dyer*, 616 S.W.2d 663, 665 (Tex. Civ. App.—Corpus Christi 1981, writ dism'd). Because we find the evidence is legally and factually sufficient to support the trial court's implied finding that the deed was

17

executed as a result of undue influence, we need not address additional legal theories asserted to support the trial court's judgment.

"In deciding whether there was undue influence in executing a deed, the court considers three factors: (1) the existence and exertion of an influence; (2) whether the influence operated to subvert or overpower the grantors' minds when they executed the deed; and (3) whether the grantors would not have executed the deed but for the influence." *Molnari v. Palmer*, 890 S.W.2d 147, 149 (Tex. App.—Texarkana 1994, no pet.) (citing *Dulak v. Dulak*, 513 S.W.2d 205, 209 (Tex. 1974), *superseded by statute on other grounds as stated in Stauffer v. Henderson*, 801 S.W.2d 858, 868 (Tex. 1990)); *see Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). The evidence must show more than a mere opportunity, however, to exercise influence. *Dulak v. Dulak*, 513 S.W.2d 205, 209 (Tex. 1974), *superseded by statute on other grounds as stated in Stauffer v. Henderson*, 801 S.W.2d 858, 868 (Tex. 1990). Although undue influence may be proved by circumstantial evidence, "the circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence." *Rothermel*, 369 S.W.2d at 922. And, although undue influence implies the existence of sufficient mental capacity to execute a deed if not hindered by another's overriding influence, "weakness of mind and body, whether produced by infirmities of age or by disease or otherwise, may be considered as a material circumstance in determining whether or not a person was in the condition to be susceptible to undue influence." *Long v. Long*, 125 S.W.2d 1034, 1036 (Tex. 1939). Further, a beneficiary's voluntary participation in the preparation or signing of a deed can be one of the considerations used to determine if there

18

was undue influence, *In re Olsson's Estate*, 344 S.W.2d 171 (Tex. Civ. App.—El Paso 1961, writ ref'd n.r.e), as can an unnatural disposition of property by the grantor, *Long*, 125 S.W.2d at 1036.

Cortes and Fernandes visited Hardy monthly to deliver the note payment on the property previously owned by Hardy. During these visits, they continually complained to Hardy that the property was no good without the minerals and that they wanted to purchase the minerals. These continual complaints and entreaties caused the elderly Hardy to feel pressured, frightened, and nervous. They were making her a "nervous wreck." They often met with Hardy one-on-one in her room at the assisted living facility and made these complaints to her privately. This frightened Hardy, and she began to lock the door to her room during the day, as she thought Cortes and Fernandes might hurt her. Hardy testified to these things and further testified that, when she failed to relent, Cortes and Fernandes told her that the IRS was going to come after her if she did not sell the minerals. Hardy was told that she needed to sign over her mineral rights to Cortes so that she would not be in trouble. Hardy testified that she felt that she had to do something because the IRS was coming after her. Threats about the IRS caused Hardy to become so nervous that she was shaking, and she thought she was going to have seizures, as she did after her husband passed away. The evidence further suggests that Hardy was essentially tricked into going alone with Cortes to the title company in Longview to sign the mineral deed. Hardy testified that she was not paid anything for her mineral rights, and she was not aware that the deed provided that Cortes was entitled to all past royalties not yet cashed out—to include the royalty payment from Sabine Oil & Gas Corporation. Hardy's testimony alone is evidence of the existence and exertion of Cortes' and Fernandes' influence. Her testimony, however, is not the sole evidence of this element.

19

According to Wendl, Hardy began to show signs of anxiety and depression in early 2016. Other witnesses testified to similar matters. Christy Brown, the executive director of Brookdale Assisted Living in Henderson, testified that, in late 2015 and early 2016, Hardy asked her if she knew about "selling . . . mineral rights and things like that." Hardy told Brown that Cortes and Fernandes kept trying to make her sell her mineral rights. Hardy seemed scared and worried and asked Brown about this subject four or five times. Having known Hardy during her entire tenure at Brookdale, Brown testified that she believed her personality would allow her to be subject to pressure to do something contrary to her best interests. In her opinion, Hardy could be "stressed" into doing something that she normally would not do. Around this same time, other Brookdale residents began to express concern about Hardy as well. They were aware of the pressure on Hardy to sell her minerals and were concerned about the effects of this pressure on Hardy.

Kristin Barnhart, who provided physical therapy to Hardy twice weekly, also noticed changes in Hardy in early 2016. Barnhart was formerly a resource coordinator for the Department of Aging and Disability Services. Barnhart reported Hardy exhibiting signs of stress and depression. She was reportedly lethargic, would not get dressed, began having trouble with her balance, and seemed to have failing health. Based on her experience and training, Barnhart believed that these were all signs that Hardy was being unduly influenced.

Sherry Haydel, a legal assistant with U.S. Title Company, testified that, a couple of months before the mineral deed was signed, Cortes contacted her to let her know that Hardy intended to convey her mineral rights to Cortes. Then, without an appointment, Cortes and Hardy "just showed up" February 5 to execute the mineral deed. Haydel met with Cortes and Hardy in her office and

20

went over the deed—which was already prepared—with Hardy. Although Haydel did not go over the deed line-by-line with Hardy, she did explain that Hardy was deeding seventy-five percent of her undivided interest in the minerals to Cortes. Hardy nodded in response. Hardy did not say anything during the entire transaction. Her only response was to nod with her head down. And, although Cortes contacted Haydel a couple of times regarding preparation of the deed, she never "heard a word" from Hardy. Cortes provided Haydel with the terms of the deed. Hardy was not advised that she was also deeding past royalties to Cortes.

This evidence not only suggests the continued existence and exertion of influence, it further supports the finding that the influence operated to subvert or overpower Hardy's mind when she executed the deed. Hardy testified that she had given up, and this state of mind is reflected at the deed signing by her non-verbal communication in simply nodding and looking down. In the months before the deed signing, Hardy became stressed, depressed, anxious, and worried. Hardy testified that she felt she had no choice but to sell the minerals and that she "just couldn't take it any longer." This, too, is evidence that Hardy would not have executed the deed but for Cortes' and Fernandes' influence. In fact, Hardy testified she would not have deeded the minerals to Cortes had she not been repeatedly pressured to do so, had she not been threatened with the IRS, and had she not been so frightened that she felt it necessary to lock her door.

Cortes—who testified at the injunction hearing only—stated that the property was subject to a "mining agreement" at the time she purchased it[19] and that topsoil had been removed from the property for a period of five years. She testified that Hardy agreed to sell her the mineral rights in

---

[19]This was an agreement for the removal of topsoil from the property.

exchange for the value of the excavation of the topsoil. Although her testimony is somewhat unclear, it appears that she took the position at the injunction hearing that she paid for the mineral rights when she initially purchased the property,[20] for the total purchase price of $65,000.00 "for the property and the mineral right." Cortes further testified that she did not force Hardy to sign the mineral deed, nor did she "harass" her into doing so. She claimed that Randy also accompanied Hardy to the title company to execute the deed, although Haydel testified that only Cortes and Hardy were present. She further testified that Hardy gave her permission to disburse the $67,000.00 check from Sabine Oil & Gas Corporation and to pay herself $36,000.00 from the proceeds of that check "for the mineral rights that had been lost over the years."

Jimmy Don Reedy, who executed the 2010 agreement with Hardy and Randy to excavate topsoil from the property, testified that he removed less than ten fourteen-yard loads of topsoil from the property. According to Reedy, the removal of that quantity of topsoil is not enough to cause any kind of damage to the land. The topsoil was not removed over a five-year period. Instead, Reedy testified that it was removed fairly near the time of the agreement. In 2010, Fernandes asked Reedy to leave the property, and he did so. According to Reedy, if Cortes told Hardy that the land was no good because the topsoil had been removed, that would be false.

After examining the entire record and applying the rules mentioned, we conclude the evidence is legally and factually sufficient to support the trial court's judgment rescinding the mineral deed.

---

[20]Cortes testified that, when she purchased the property from Coutts, she paid $35,000.00 cash and assumed Coutts' note to Hardy in the amount of $40,000.00.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     May 22, 2018
Date Decided:       June 20, 2018